# Exhibit Q

Westlaw.

Slip Copy
Slip Copy, 2005 WL 711814 (D.D.C.)
(Cite as: 2005 WL 711814 (D.D.C.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court, District of Columbia.
Mahmoad ABDAH, et al., Petitioners,
v.
George W. BUSH, et al., Respondents.
**No. Civ.A. 04-1254(HHK).**

March 29, 2005.

David H. Remes, Covington & Burling, Washington, DC, Marc D. Falkoff, Covington & Burling, New York, NY, for Petitioners.

Lisa Ann Olson, Preeya M. Noronha, Robert J. Katerberg, Terry Marcus Henry, U.S. Department of Justice, Civil Division, Washington, DC, for Respondents.

MEMORANDUM OPINION

KENNEDY, J.

*1 Petitioners are aliens who are being held by the United States military at Guantánamo Bay Naval Base in Cuba and who have petitioned this court for a writ of habeas corpus. While the merits of their individual claims have not yet been adjudicated, this court (Green, J.) has determined that some of the causes of action set forth in their habeas petition survive Respondents' motion to dismiss. This ruling is currently on appeal. Presently before the court is Petitioners' motion for a preliminary injunction. Asserting that Respondents have contemplated or are contemplating transferring them to the custody of foreign nations to be further detained and possibly tortured, Petitioners seek an order from this court that would require Respondents to provide their counsel and this court with 30 days' advance notice of any Petitioner's removal from Guantánamo. Upon consideration of the briefing of the parties, the submissions that accompany the briefing, and the arguments of counsel at a hearing, the court concludes that Petitioners' motion should be granted.

I. BACKGROUND

Petitioners are thirteen [FN1] Yemeni nationals who each allegedly traveled to Pakistan for reasons "unrelated to any activities of al Qaeda or the Taliban," Pet. ¶ 19, [FN2] such as pursuing religious studies, id. ¶¶ 26, 40, 43, 45, 47; obtaining medical care, id. ¶ 33; and seeking better employment, id. ¶ 36. All were "arrested by Pakistani police as part of a dragnet seizure of Yemeni citizens." Id. ¶ 19. Details of their capture and subsequent movements are hazy, but Petitioners allege that they were seized in 2001 or 2002, id. ¶ 20, "far from the battlefield." Id. ¶ 61. All were then transferred to United States military custody and transported to the United States Naval Base at Guantánamo Bay, Cuba ("Guantánamo"), where they have since been held, "virtually incommunicado," id. ¶ 63, as "enemy combatants." All Petitioners deny that they are enemy combatants or that they have otherwise been "part of or supporting forces hostile to the United States." Id. ¶ 15.

FN1. The court notes some inconsistency in the parties' briefing regarding the number of Petitioners included in this action. The petition for writ of habeas corpus lists *fourteen* individuals: (1) Mahmoad Abdah; (2) Majid Mahmoud Ahmed; (3) Abdulmalik Abdulwahab Al-Rahabi; (4) Makhtar Yahia Naji Al-Wrafie; (5) Aref Abd Il Rheem; (6) Yasein Khasem Mohammad Esmail; (7) Adnan Farhan Abdul Latif; (8) Jamal Mar'i; (9) Othman Abdulraheem Mohammad; (10) Adil Saeed El Haj Obaid; (11) Mohamed Mohamed Hassan Odaini; (12) Sadeq Mohammed Said; (13) Farouk Ali Ahmed Saif; and (14) Salman Yahaldi Hsan Mohammed Saud. Pet. ¶¶ 22-51 and caption. Petitioners' motion for a preliminary injunction identifies *thirteen* Petitioners, Pet'rs' Mot. at 2, while Respondents mention *twelve* detainees, stating they have no records corresponding to Aref Abd Il Rheem. Resp'ts' Opp'n at 2, n. 1.

FN2. "Pet." refers to Petitioners' petition for writ of habeas corpus filed July 27, 2004.

On June 28, 2004, the Supreme Court determined that "the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of [the detainees at Guantánamo Bay] who claim to be wholly innocent of wrongdoing." *Rasul v. Bush*, --- U.S. ----, 124 S.Ct. 2686, 2699, 159 L.Ed.2d 548 (2004). Shortly thereafter, the Department of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 711814 (D.D.C.)
**(Cite as: 2005 WL 711814 (D.D.C.))**

Defense issued an order creating the Combatant Status Review Tribunal ("CSRT") to evaluate the status of each detainee at Guantánamo. *In re Gunatanamo Detainee Cases, 355 F.Supp.2d 443, 450 (D.D.C.2005), appeal docketed,* No. 05-8003 (D.C.Cir. Mar. 21, 2005). On July 27, 2004, Petitioners filed a petition for writ of habeas corpus, seeking to obtain "a judicial determination of whether there is a factual basis for Respondent's determination that they are 'enemy combatants,' " Pet. ¶ 14, and asserting that the government has "advanced no justification" for their "arrest, transportation and continued incarceration." *Id.* ¶ 16. Their petition was coordinated with ten other habeas cases filed by other Guantánamo detainees to allow Judge Joyce Hens Green, the designated judge, to resolve common issues of law and fact.

**\*2** On January 31, 2005, Judge Green issued a memorandum opinion and order granting in part and denying in part Respondents' motion to dismiss, finding that the detainees "have the fundamental right to due process of law under the Fifth Amendment," *In re Gunatanamo Detainee Cases, 355 F.Supp.2d at 463,* and that the CSRT proceedings failed to protect those due process rights. *Id. at 468.*

Subsequently, Judge Green issued an order certifying her opinion for interlocutory appeal and staying the proceedings in the eleven cases pending resolution of Respondents' appeal. Petitioners now contend that "Respondents have contemplated or are contemplating removal of some or all Petitioners from Guantánamo to foreign territories for torture or indefinite imprisonment without due process of law." Pet'rs' Mot. for Prelim. Inj. ("Pet'rs' Mot.") at 1. Fearing that any such transfer would "also circumvent[ ] Petitioners' right to adjudicate the legality of their detention," *id.* at 6, Petitioners seek a preliminary injunction requiring Respondents to provide Petitioners' counsel with 30 days' advance notice of "any intended removal of Petitioners from Guantanamo Bay Naval Base," *id.* at 1, to enable counsel to contest the removal if they deem it advisable to do so.

## II. ANALYSIS
### A. Stay of February 3, 2005

Respondents first argue that the stay order Judge Green issued in the eleven coordinated cases prevents this court from considering the merits of the present motion. This argument is unavailing.

On February 3, 2005, Judge Green issued an order in the eleven habeas cases that "stayed [the cases] for all purposes pending resolution of all appeals in this matter." *In re Guantanamo Detainee Cases,* No. 04-1254 (D.D.C. Feb. 3, 2005) (order). Courts have consistently recognized that a stay may be necessary preserve the status quo among the parties pending appeal. *See, e.g., Warm Springs Dam Task Force v. Gribble, 417 U.S. 1301, 1310, 94 S.Ct. 2542, 41 L.Ed.2d 654 (1974); United Mun. Distrib. Group v. FERC, 732 F.2d 202, 205 (D.C.Cir.1984); NLRB v. Sav-on Drugs, Inc., 704 F.2d 1147, 1149 (9th Cir.1983); Metzler v. United States, 832 F.Supp. 204, 208 (E.D.Mich.1993).* Here, Petitioners are not asking the court to bypass the stay and resume adjudication of their underlying claims. Rather, they seek to prevent Respondents from unilaterally and silently taking actions that may render their claims moot; thus the injunctive relief Petitioners seek would ensure the very same result that the stay itself was entered to secure. *See Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am., 412 F.2d 165, 169 (D.C.Cir.1969).* The stay order simply cannot be construed to prevent emergency relief consistent with maintenance of the status quo. *See Summit Med. Assocs., P.C. v. James, 998 F.Supp. 1339, 1351 (M.D.Ala.1998); Universal Marine Ins., Ltd. v. Beacon Ins. Co., 577 F.Supp. 829, 832 (W.D.N.C.1984).* The court therefore proceeds to consider the merits of Petitioners' request.

### B. Legal Standard

**\*3** A preliminary injunction is an "extraordinary remedy" that should only issue "when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton, 391 F.3d 251, 258 (D.C.Cir.2004)* (citing *Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)).* A court considering a preliminary injunction request must examine four factors, namely whether: (1) Petitioners will be "irreparably harmed if an injunction is not granted"; (2) there is a "substantial likelihood" Petitioners will succeed on the merits; (3) an injunction will "substantially injure" Respondents; and (4) the public interest will be furthered by the injunction. *Serono Labs., Inc., v. Shalala, 158 F.3d 1313, 1317-18 (D.C.Cir.1998).* These four factors "interrelate on a sliding scale" and must be considered in relation to one another, for " 'if the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.' " *Id. at 1318* (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C.Cir.1995)).*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 711814 (D.D.C.)
**(Cite as: 2005 WL 711814 (D.D.C.))**

C. Merits of the Preliminary Injunction Motion

1. Irreparable Injury

The court gives special scrutiny to Petitioners' claims of injury, because "the basis of injunctive relief in the federal courts has always been irreparable harm." *CityFed Fin.,* 58 F.3d at 747 (quoting *Sampson v. Murray,* 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)). To obtain preliminary injunctive relief, Petitioners must show that the injury threatening them is more than "remote and speculative." *Milk Indus. Found. v. Glickman,* 949 F.Supp. 882, 897 (D.D.C.1996). Petitioners unquestionably make such a showing.

Petitioners allege two irreparable injuries. With respect to the first, they claim that the Department of Defense is actively planning the transfer of detainees from Guantanamo to countries "for torture or indefinite imprisonment without due process of law," Pet'rs' Mot. at 1, and note that the United States has "repeatedly transferred detainees into the custody of foreign governments that employ inhumane interrogation techniques." *Id.* at 3. Respondents dispute these assertions, dismissing them as "sensationalistic allegations" based upon "hollow speculation" and "largely anonymous sources and innuendo" cited in newspaper and magazine articles, Resp'ts' Opp'n at 19, and statements from a single detainee. Respondents then describe the policy and procedures the United States employs regarding the transfer and repatriation of Guantánamo detainees, including the transfer of detainees to the control of other governments for investigation and possible prosecution. Respondents state that "a key concern is whether the foreign government will treat the detainee humanely and in a manner consistent with its international obligations," Resp'ts' Opp'n at 4, and that "it is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured." *Id.* Respondents also provide declarations from high-level Department of State and Department of Defense officials outlining the consultations and deliberations the agencies undertake prior to transferring a detainee, and indicating that among 211 detainees the military has transferred out of Guantánamo to date, 65 were provided to foreign governments for ongoing detention. *Id.,* Prosper Decl. ¶ 2, Waxman Decl. ¶ 4.

**\*4** These declarations concerning general policy and practice, however, do not entirely refute Petitioners'

claims or render them frivolous. The court has reviewed Petitioners' exhibits, and notes that in addition to citing anonymous sources, the submitted articles quote by name former Guantánamo detainees, former high-level officials from the United Kingdom and Pakistan, and current and former employees of the United States government who were themselves involved in transferring detainees. The court, however, need not determine whether Petitioners' fear of torture constitutes the requisite "irreparable injury" because their second claim of injury clearly satisfies the preliminary injunction standard.

Petitioners contend that if the United States military transfers Petitioners from Guantánamo to overseas custody, it would effectively extinguish those detainees' habeas claims by fiat. Such transfers would eliminate any opportunity for Petitioners to ever obtain a fair adjudication of their "fundamental right to test the legitimacy of [their] executive detention." *Lee v. Reno,* 15 F.Supp.2d 26, 32 (D.D.C.1998). The parties agree that upon transfer, the court will no longer retain jurisdiction to provide any relief Petitioners seek. Hr'g Tr. at 19:7-10; Resp'ts' Opp'n at 6 ("once transferred, a detainee is no longer subject to the control of the United States"), Waxman Decl. ¶ 5. While Respondents contest Judge Green's determination that Petitioners have legally cognizable due process claims properly before the court, pending their appeal they may not act to deprive this court of its jurisdiction over the very "corpus" of this case; indeed, the "federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts for the protection of their rights in those tribunals." *Abu Ali v. Ashcroft,* 350 F.Supp.2d 28, 54 (D.D.C.2004) (quoting *Alabama Great S.R. Co. v. Thompson,* 200 U.S. 206, 218, 26 S.Ct. 161, 50 L.Ed. 441 (1906)).

2. Likelihood of Success

Petitioners argue that they have properly invoked this court's jurisdiction and have stated actionable claims under the Due Process Clause of the Fifth Amendment and the Geneva Convention, thereby demonstrating a likelihood of success. Respondents urge instead that Petitioners fail to make the required showing "that they are likely to succeed in establishing a judicially enforceable entitlement to veto the same repatriation that they previously told the Court Respondents were required to conduct." [FN3] Resp'ts' Opp'n at 11 (emphasis omitted). Although the court would use somewhat different language to characterize the relevant standard, Respondents are correct that *if* there are no

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 711814 (D.D.C.)
**(Cite as: 2005 WL 711814 (D.D.C.))**

circumstances under which Petitioners could obtain a court order preventing a contemplated transfer, a preliminary injunction should not be granted. Respondents are wrong, however, in arguing that there are in fact no such circumstances present, and that consequently there is no legal basis for judicial involvement in transfer or repatriation decisions regarding Petitioners.

> FN3. This last contention is perplexing, because it seems beyond question that advocating for release into freedom is not equivalent to advocating for transfer from ongoing detention in one locale to ongoing detention in another.

*5 To the contrary, transfer of Petitioners without notice and leave of court is forbidden by Fed. R.App. P. 23(a), which requires that "pending review of a decision in a habeas corpus proceeding ___[FN4] commenced before a court ... the person having custody of the prisoner must not transfer custody to another unless a transfer is directed in accordance with this rule." The Rule "was designed to prevent prison officials from impeding a prisoner's attempt to obtain habeas corpus relief by physically removing the prisoner from the territorial jurisdiction of the court in which a habeas petition is pending." *Hammer v. Meachum,* 691 F.2d 958, 961 (10th Cir.1982) (citing *Jago v. United States Dist. Court,* 570 F.2d 618, 626 (6th Cir.1978), and *Goodman v. Keohane,* 663 F.2d 1044, 1047 (11th Cir.1981)). Respondents' contention that Rule 23(a) is not typically applied in situations involving the transfer of prisoners to the custody of foreign nations, Resp'ts' Br. in Resp. to Pet'rs' Notice of Supp. Auth. at 3, while correct, is of no moment. Its application here is consistent with both the text of the rule and its underlying purpose. Indeed, Rule 23(a) acquires an even greater importance in the context of Petitioners' case. When a prisoner with a pending habeas action is simply transferred from one state to another in violation of Rule 23(a), the transfer "does not divest [the court of its] jurisdiction over the action." *Reimnitz v. State's Attorney of Cook County,* 761 F.2d 405, 409 (7th Cir.1985). Here, though, Petitioners' transfer to another nation would assuredly deprive the court of its jurisdiction. Petitioners thus demonstrate that they have a clear likelihood of success in blocking a transfer made absent notice to, and approval from, the court.

> FN4. Jurisdiction over a petition for a writ of habeas corpus is determined when the petition is filed. *Barden v. Keohane,* 921

F.2d 476, 477 n. 1 (3d Cir.1990) (citing accordance with *Ross v. Mebane,* 536 F.2d 1199 (7th Cir.1976) (per curiam); *Harris v. Ciccone,* 417 F.2d 479 (8th Cir.1969), *cert. denied,* 397 U.S. 1078, 90 S.Ct. 1528, 25 L.Ed.2d 813 (1970)).

Respondents further argue against the application of Rule 23(a) by referring to a footnote in *Rasul,* which remarked that after the Supreme Court granted certiorari, two petitioners in that case, Shafiq Rasul and Asif Iqbal, were "released from custody." *Rasul,* --- U.S. ----, ---- n. 1, 124 S.Ct. 2686, 2691 n. 1, 159 L.Ed.2d 548. Respondents argue that this reference demonstrates that the Supreme Court "did not give any hint of perceiving any violation" of the Supreme Court's equivalent to Rule 23(a). Resp'ts' Br. in Resp. to Pet'rs' Notice of Supp. Auth. at 4; *see also* Hr'g Tr. at 7:20-21. The court declines Respondents' invitation to make such an inference, both because there is no indication in *Rasul* whether the two named petitioners were transferred into foreign custody or released outright, and because neither party presented the issue to the Supreme Court.

3. Harm to Respondents

Respondents assert that granting Petitioners' motion would "illegitimately encroach on the foreign relations and national security prerogatives of the Executive Branch." Resp'ts' Opp'n at 1. They also argue that granting Petitioners' injunction request would harm the government in "myriad" other ways, by "undermining the United States Government's ability to investigate and resolve allegations of mistreatment or torture"; "undermin[ing] the United States' ability to reduce the numbers of individuals under U.S. control"; impairing the United States' coordination with other governments' efforts in the war on terrorism; and "encumber[ing] ... an already elaborate process leading up to transfers or repatriations." Resp'ts' Opp'n at 22. At the preliminary injunction hearing held on March 22, 2005, Respondents' counsel amplified these contentions, noting that the advance notice requirement would "undermine[ ] the executive's ability to speak with one voice." Hr'g Tr. at 8:10-11. Beyond these vague premonitions, however, the court does not have any indication that notifying Petitioners' counsel 30 days ahead of planned transfers of their clients will intrude upon executive authority. The preliminary injunction Petitioners seek will not require, or even enable, the court to take the two *specific* actions which Respondents' declarants warn against: forcing State Department officials to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 711814 (D.D.C.)
**(Cite as: 2005 WL 711814 (D.D.C.))**

Page 5

"unilaterally ... disclose outside appropriate Executive branch channels its communications with a foreign government relating to particular mistreatment or torture concerns," Resp'ts' Opp'n, Prosper Decl. ¶ 10, and publicly disclosing the facts gathered and analyses prepared by various State Department offices, or bringing these findings "to the attention of officials and others in foreign States ..." *Id.* ¶ 11.

**\*6** In evaluating the alleged injury Respondents would suffer if the preliminary injunction is granted, the court balances the respective hardships imposed upon the parties. *See O'Donnell Constr. Co. v. District of Columbia,* 963 F.2d 420, 429 (D.C.Cir.1992); *George Washington Univ. v. District of Columbia,* 148 F.Supp.2d 15, 18-19 (D.D.C.2001). While the injunction Petitioners seek might restrict or delay Respondents with respect to one aspect of managing Petitioners' detention, such a consequence does not outweigh the imminent threat facing Petitioners with respect to the *entirety* of their claims before the court. [FN5]

> FN5. Respondents' assertion that they are merely "relinquishing" custody of detainees whom the government is simply "no longer interested in detaining," Hr'g Tr. at 9:20-21, is disingenuous. According to Petitioners' allegations, unanswered by the United States, they have been held at Guantánamo for periods of several years, *see, e.g.,* Pet'rs' Mot., Exs. K, M, O, S. The government's invocation of sudden exigency requiring their transfer now cannot trump Petitioners' established due process rights to pursue their habeas action in federal court. *See Rasul,* --- U.S. at ---- - ----, 124 S.Ct. at 2698-99; *In re Guantanamo Detainee Cases,* 355 F.Supp.2d at 464 ("Of course, it would be far easier for the government to prosecute the war on terrorism if it could imprison all suspected 'enemy combatants' at Guantanamo Bay without having to acknowledge and respect any constitutional rights of detainees. That, however, is not the relevant legal test ... constitutional limitations often, if not always, burden the abilities of government officials to serve their constituencies.").

**4. Public Interest**

Finally, the court looks to whether granting the preliminary injunction request implicates the public interest, and if so, whether it confers benefit or produces harm. Respondents simply conflate the public interest with their own position, noting that "the public interest and harm-to-non-movant factors converge." Resp'ts' Opp'n at 21. It is indisputable that the public interest favors vigorously pursuing terrorists and holding them to account for their actions. It is misleading, however, to frame the relevant interest here as the government's ability "to detain enemy combatants to prevent them from returning to the fight and continuing to wage war against the United States." Resp'ts' Opp'n at 21-22. Petitioners' current designation as enemy combatants is not a foregone conclusion; challenges to the accuracy and legitimacy of the government's determination that Petitioners have engaged in hostilities against the United States, or aided those who have, are the very core of Petitioners' underlying habeas claims. Respondents' assertion to the contrary, that "Petitioners' enemy combatant status was recently confirmed in Combatant Status Review Tribunals," Resp'ts' Opp'n at 2, ignores Judge Green's ruling that the CSRTs as so far implemented are constitutionally deficient. Instead, this factor tilts in Petitioners' favor, because the public has a strong interest in ensuring that its laws do not subject individuals to indefinite detention without due process; "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n,* 23 F.3d 1071, 1079 (6th Cir.1994).

**D. All Writs Act**

Petitioners also ask the court to exercise its authority under the All Writs Act, which provides in relevant part that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The All Writs Act "empowers a district court to issue injunctions to protect its jurisdiction ...," *SEC v. Vision Communications, Inc.,* 74 F.3d 287, 291 (D.C.Cir.1996), and a court may grant a writ under the Act whenever it determines such action necessary "to achieve the ends of justice entrusted to it." *Adams v. United States,* 317 U.S. 269, 273, 63 S.Ct. 236, 87 L.Ed. 268 (1942). Were the court to find adequate "alternative remedies" unavailable, *Clinton v. Goldsmith,* 526 U.S. 529, 537, 119 S.Ct. 1538, 143 L.Ed.2d 720 (1999), or "the traditional requirements of an injunction" inapplicable, *Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1101 n. 13 (11th Cir.2004), it could employ the Act to order the relief Petitioners seek. Because Petitioners have made a

Slip Copy

Slip Copy, 2005 WL 711814 (D.D.C.)
**(Cite as: 2005 WL 711814 (D.D.C.))**

clear showing that a preliminary injunction is warranted under the familiar four-part test, though, the court need not take recourse to the All Writs Act.

### III. CONCLUSION

**\*7** For the foregoing reasons, the court finds that Petitioners satisfy the requirements for a preliminary injunction, and therefore grants their present motion. An appropriate order accompanies this memorandum opinion.

Slip Copy, 2005 WL 711814 (D.D.C.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit R

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MAHMOAD ABDAH, *et al.*, | ) |
| Petitioners, | ) |
| v. | ) Civil Action No. 04-1254 (HHK) (RMC) |
| GEORGE W. BUSH, *et al.*, | ) |
| Respondents. | ) |

## AMENDED TEMPORARY RESTRAINING ORDER

For the reasons stated in the Memorandum Opinion issued this date, it is hereby ordered that Defendants, their agents, servants, employees, confederates, and any persons acting in concert or participation with them, or having knowledge of this Order by personal service or otherwise, be, and are, hereby immediately and temporarily restrained from removing Petitioners from Guantanamo Bay Naval Base until this matter can be determined at a hearing for a preliminary injunction or for ten days, whichever is less. This Amended Temporary Restraining Order replaces the Initial Temporary Restraining Order issued on March 12, 2005 at 3:40 p.m.

**SO ORDERED.**

DATE: March 12, 2005.

TIME: 3:40 p.m. (Initial TRO)
       4:20 p.m. (Amended TRO)

/s/
_____
ROSEMARY M. COLLYER
United States District Judge

# Exhibit S

Westlaw.

366 F.Supp.2d 72                                                                                      Page 1
366 F.Supp.2d 72
**(Cite as: 366 F.Supp.2d 72)**

H

**Motions, Pleadings and Filings**

United States District Court,
District of Columbia.
Isa Ali Abdulla ALMURBATI, et al., Petitioners,
v.
George Walker BUSH, et al., Respondents.
**No. CIV.A. 04-1227RBW.**

April 14, 2005.

**Background:**    Habeas petitioners, who were
Bahraini nationals who had been detained at United
States Naval Base at Guantánamo Bay, Cuba as
"enemy combatants," filed motion for preliminary
injunction prohibiting the respondents from
transferring any of them without first providing
advance written notice.

**Holdings:** The District Court, Walton, J., held that:
(1) petitioners failed to show that their threatened
injuries were not remote and speculative, and
(2) All Writs Act did not provide a basis for court to
interfere with the respondents' prerogative to release
any of habeas petitioners once they decided that the
petitioners' detention by the United States was no
longer necessary.
Motion denied.

West Headnotes

**[1] Federal Courts** ⬤~5
170Bk5 Most Cited Cases
Federal district courts, as courts of limited
jurisdiction, possess only such authority as is
conferred to them by the Constitution and acts of
Congress, and that authority cannot be expanded by
judicial decree.

**[2] Injunction** ⬤~138.21
212k138.21 Most Cited Cases
Preliminary injunctive relief may be warranted where
there is a particularly strong likelihood of success on
the merits even if there is a relatively slight showing
of irreparable injury; however, a party seeking
injunctive relief must demonstrate at least "some
injury" since the basis for injunctive relief in the
federal courts is irreparable harm.

**[3] Injunction** ⬤~138.6
212k138.6 Most Cited Cases
To obtain preliminary injunctive relief, a movant
must show that the threatened injury is not merely
remote and speculative.

**[4] Habeas Corpus** ⬤~796.1
197k796.1 Most Cited Cases

**[4] War and National Emergency** ⬤~11
402k11 Most Cited Cases
Habeas petitioners, who were Bahraini nationals who
had been detained at United States Naval Base at
Guantánamo Bay, Cuba as "enemy combatants,"
were not entitled to preliminary injunction
prohibiting respondents from transferring any of
them without first providing advance written notice;
petitioners, who relied extensively on news reports
and articles that suggested that the government was
involved in a conspiracy to ship the Guantánamo Bay
detainees to countries where they would be tortured
and detained indefinitely at the behest of the United
States, failed to show that their threatened injuries
were not remote and speculative.

**[5] Habeas Corpus** ⬤~252
197k252 Most Cited Cases
For a sovereign to be considered in custody of a
habeas petitioner over whom it does not exercise
"physical control," a court must be able to conclude
that the sovereign is in "actual or constructive
custody" of the petitioner within the meaning of the
habeas statute as a result of the respondent being
responsible for significant restraints on the
petitioner's liberty.

**[6] Habeas Corpus** ⬤~796.1
197k796.1 Most Cited Cases
All Writs Act did not provide a basis for court to
interfere with the respondents' prerogative to release
any of habeas petitioners once they decided that the
petitioners' detention by the United States was no
longer necessary; thus, petitioners, Bahraini nationals
who had been detained at United States
Naval Base at Guantánamo Bay, Cuba as "enemy
combatants," were not entitled to preliminary
injunction prohibiting respondents from transferring
any of them without first providing advance written
notice. 28 U.S.C.A. § § 1651, 2241(c).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

366 F.Supp.2d 72
366 F.Supp.2d 72
**(Cite as: 366 F.Supp.2d 72)**

**[7]** War and National Emergency ☞11
402k11 Most Cited Cases

Interests of United States and the public did not weigh in favor of granting preliminary injunction prohibiting respondents from transferring Bahraini nationals who had been detained at United States Naval Base at Guantánamo Bay, Cuba as "enemy combatants" without first providing them advance written notice; intervention in transfer and repatriation decisions would prevent the United States from speaking with one voice in its dealings with foreign governments, and would undermine the United States' ability to reduce the number of individuals under its control and its effectiveness in eliciting the cooperation of other governments in the war on terrorism.

**\*73** Ralph A. Taylor, Kevin B. Bedell, Dorsey & Whitney LLP, Washington, DC, Christopher G. Karagheuzoff, Joshua Colangelo-Bryan, Mark S. Sullivan, Stewart D. Aaron, Dorsey & Whitney LLP, New York City, for Petitioners.

Terry Marcus Henry, U.S. Department of Justice Civil Division, Washington, DC, for Respondents.

### MEMORANDUM OPINION

WALTON, District Judge.

Currently before this Court is the Petitioners' Motion for Preliminary Injunction [D.E. # 101] ("Pets.' Mot."), which seeks an Order, pursuant to Rule 65 of the Federal Rules of Civil Procedure and the All Writs Act, 28 U.S.C. § 1651, that would prohibit the respondents from transferring any of the petitioners from the United States Naval Base at Guantánamo Bay, Cuba ("GTMO") without first providing the Court and counsel with thirty days' advance written notice of such intended transfer, including notice of the location to which the respondents intend to transfer the petitioners.  Pets.' Mot. at 1. Upon consideration of the motion, respondents' opposition thereto, the petitioners' reply, and arguments of counsel, the petitioners' motion must be denied. However, so that the Court is kept abreast of the petitioners' detention status, it will require the respondents to submit a declaration to this Court advising it of any transfers and certifying that any such transfers or repatriations were not made for the purpose of merely continuing the petitioners' detention on behalf of the United States or for the purpose of extinguishing this Court's jurisdiction over the petitioners' actions for habeas relief for a reason unrelated to the decision that the petitioners' detention is **\*74** no longer warranted by the United

States. [FN1]

> FN1.  An Order consistent with the Memorandum Opinion is being issued contemporaneously herewith.

### I. Background

Petitioners are six Bahraini nationals who have been classified as "enemy combatants" by the respondents and are being detained at GTMO.  [FN2] As provided in their Petition for Writ of Habeas Corpus, filed with this Court on July 22, 2004, the petitioners maintain that they are being "detained in violation of the Constitution, treaties and laws of the United States." Memorandum of Law in Support of Motion for Preliminary Injunction Enjoining Respondents from Transfer of Petitioners from Guantánamo Bay Without Advance Notification to Counsel ("Pets.' Mem.") at 3. The respondents moved to dismiss the petitioners' habeas petitions and this case, along with several other cases before other judges of this Court, was transferred to Judge Joyce Hens Green for purposes of having common issues raised in the several cases collectively addressed by one judge. Ultimately, Judge Green denied in part and granted in part the respondents' motion. See In re Guantanamo Detainee Cases, 355 F.Supp.2d 443, 443 (D.D.C.2005). Judge Green subsequently issued an order certifying her rulings for interlocutory appeal to the United States Court of Appeals for the District of Columbia Circuit and staying the proceedings pending resolution of the respondents' appeal.

> FN2.  The named petitioners who are detained are Isa Ali Abdulla Almurbati, Adel Kamel Abdulla Hajee, and Salah Abdul Rasool Al Bloushi. The other three named petitioners are Mohamad Ali Abdulla Almurbati, Abdullah Kamel Abdulla Jajee, and Abdul Rasool Ali Al Bloushi, who have initiated this proceeding as next friends of the other three detainees. When the Court refers to the petitioners throughout this opinion it is referencing not only the named petitioners who are in detention, but also the unnamed detainees on whose behalf this action has been filed.

In the past several months, there have been a number of media reports concerning earlier transfers of detainees by the United States to countries where they were allegedly subjected to "inhumane interrogations techniques" and the alleged anticipated transfers of current GTMO detainees to countries

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

where they would be physically abused or tortured. Pets.' Mem. at 4-6. In addition, two of the petitioners have proffered their declarations wherein they represent that they have been told by unidentified "U.S. personnel" that they will be transferred to countries where they will be sexually abused or tortured. *Id.* at 2. Consequently, the petitioners have now filed the instant motion requesting an order from this Court prohibiting the respondents from transferring any of the petitioners from GTMO without providing thirty days advance notice to the Court and counsel. In response, the respondents contend that "the motion[ ] is based on rumors, myths, and hype that are refuted by sworn testimony of senior United States Government officials." Respondents' Memorandum in Opposition to Petitioners' Motions for Temporary Restraining Orders and Preliminary Injunctions ("Resp'ts' Opp'n") at 5.

**II. Scope of the Court's Authority**

[1] A necessary predicate for addressing the petitioners' motion is an evaluation of this Court's judicial authority to grant the petitioners' requested relief. Federal district courts, as courts of limited jurisdiction, possess only such authority as is conferred to them by the Constitution and acts of Congress, and this authority cannot "be expanded by judicial decree." *75Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391, (1994); *Friends of the Earth v. United States Envtl. Prot. Agency,* 333 F.3d 184, 187 (D.C.Cir.2003); *Commodity Futures Trading Comm'n v. Nahas,* 738 F.2d 487, 492 (D.C.Cir.1984). As a consequence of this limitation, the Court must, in the first instance, assess its authority to provide the relief requested by a party. *Abu Ali v. Ashcroft,* 350 F.Supp.2d 28, 41 (D.D.C.2004). The petitioners assert that this "Court has the inherent power" to afford them the requested relief pursuant to the All Writs Act through the issuance of an injunction "to protect its jurisdiction," and "to preserve the status quo between the parties pending a final determination of the merits of [this] action." Pets.' Mem. at 7 (citations omitted).

The separation of powers doctrine lies at the heart of the structure of our constitutional structure of government. In establishing [our] three branches of government, the Legislative, the Executive, and the Judicial, the Framers [of the Constitution] conferred separate and distinct powers to each, together with correlative checks and balances, as a safeguard against the encroachment or aggrandizement of one branch at the expense of

another. *United States v. Scott,* 688 F.Supp. 1483, 1488 (D.N.M.1988) (quoting *Immigration & Naturalization Service v. Chadha,* 462 U.S. 919, 960, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (Powell, J., concurring)). Moreover, courts must be mindful of the Article III proscription that they may not exercise "executive or administrative duties of a nonjudicial nature." *Buckley v. Valeo,* 424 U.S. 1, 123, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). The purpose of this rule is "to maintain the separation between the Judiciary and the other branches of the Federal Government by ensuring that judges do not encroach upon executive or legislative authority or undertake tasks that are more properly accomplished by those branches." *Morrison v. Olson,* 487 U.S. 654, 680-81, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). Thus, in deference to the Executive Branch, courts are reluctant to intrude upon the discretionary authority of the Executive in military and national security matters. *Hamdi v. Rumsfeld,* 542 U.S. 507, 124 S.Ct. 2633, 2647, 159 L.Ed.2d 578 (2004); *Dep't of Navy v. Egan,* 484 U.S. 518, 530, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988). Accordingly, the Supreme Court has acknowledged "the generally accepted view that foreign policy [is] the province and responsibility of the Executive." *Egan,* 484 U.S. at 529, 108 S.Ct. 818 (quoting *Haig v. Agee,* 453 U.S. 280, 293-94, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981)). "As to these areas of Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities." *Id.* at 529-30, 108 S.Ct. 818 (quoting *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)). It is against this legal landscape that the Court must assess whether it can grant the relief requested by the petitioners.

**III. The Petitioners' Motion for a Preliminary Injunction**

[2] In determining whether to grant a motion for a preliminary injunction, the Court must consider four factors: (1) whether the petitioners have demonstrated that there is a substantial likelihood that they will prevail on the merits of their claims; (2) whether the petitioners have shown that they would be irreparably harmed if injunctive relief is not awarded; (3) whether the issuance of injunctive relief would not "substantially harm" the other parties; and (4) whether awarding the relief is in the public interest. *76Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977) (citing *Virginia Petroleum Jobbers Assoc. v. FPC,* 259 F.2d 921, 925 (D.C.Cir.1958)); *Al-Fayed v. CIA,* 254 F.3d 300, 303 (D.C.Cir.2001).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

366 F.Supp.2d 72
366 F.Supp.2d 72
(Cite as: 366 F.Supp.2d 72)

Page 4

These factors should be balanced against one another and "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C.Cir.1995). Thus, injunctive relief may be warranted "where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *Id.* However, a party seeking injunctive relief must "demonstrate at least 'some injury' ... since '[t]he basis for injunctive relief in the federal courts has always been irreparable harm.' " *Id.* (citations omitted).

### A. Irreparable Harm

The petitioners allege that they "stand to suffer immeasurable and irreparable harm--from torture to possible death--at the hands of a foreign government like Pakistan, Afghanistan, Saudi Arabia or Yemen" if they are transferred to such a country. Pets.' Mem. at 7. They further contend that "[t]ransfer to another country, even if 'only' for continued imprisonment, also circumvents Petitioners' right to adjudicate the legality of their detention in this Court." *Id.* Despite the petitioners' allegations--that they may suffer torture and possible death if transferred to certain countries--they have submitted no evidence in support of these assertions. Instead, the petitioners rely extensively on "a range of [allegedly] credible news reports," and statements from two of the petitioners in this case, to support their allegations. Pets.' Mem. at 4. For example, the petitioners cite an article authored by Douglas Jehl, entitled *Pentagon Seeks to Transfer More Detainees From Base in Cuba,* that appeared on page A-one of the March 11, 2005 edition of the New York Times. This article alleges that the United States Government is "contemplating 'a plan to cut by more than half the population at its detention facility in Guantánamo Bay, Cuba, in part by transferring hundreds of suspected terrorist to prisons in Saudi Arabia, Afghanistan and Yemen.' " According to the petitioners, media reports have represented that "the U.S. Government has repeatedly transferred detainees into the custody of foreign governments that employ inhumane interrogation techniques." Pets.' Mem. at 4 (citing Jane Mayer, *Outsourcing Torture,* New Yorker, Feb. 14, 2005 ¶ 7). [FN3] Moreover, one petitioner alleges that he was told by an unidentified United States official at Guantánamo Bay that "he would be sent to a prison where he would be raped." *Id.* at 2 (citing Declaration of Joshua Colangelo-Bryan dated March 15, 2005 ("Colangelo-Bryan Decl.") ¶ 2). Another petitioner alleges that he was

also told by an unidentified United States official at Guantánamo Bay that "he would be sent to a prison that would turn him into a woman." *Id.* (citing Colangelo-Bryan Decl. ¶ 3). Notably, however, the petitioners do not allege that these statements were made by officials who will play a role in determining where they will be sent upon their release.

> FN3. The petitioners also cite other articles as support for their positions. *See, e.g.,* Rajiv Chandrasekaran & Peter Finn, *U.S. Behind Transfer of Terror Suspects,* Wash. Post, Mar. 11, 2002, at A1; Megan K. Stack & Bob Drogin, *Detainee Says U.S. Handed Him Over for Torture,* L.A. Times, Jan. 13, 2005, at A1.

Despite these admittedly disturbing news reports, and the allegations of the two petitioners, it is significant that in response the respondents have submitted declarations "refut[ing] the factual scenario **\*77** that [the] petitioners portray." Resp'ts' Opp'n at 8. Specifically, the respondents state that "it is the policy of the United States, consistent with Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, not to repatriate or transfer individuals to other countries where it believes it is more likely than not that they will be tortured." Resp'ts' Opp'n at 8 (citing Declaration of Matthew C. Waxman dated March 8, 2005 ("Waxman Decl.") ¶ 6). [FN4] To insure that such repatriations or transfers do not occur, the Department of Defense ("DoD") represents that it consults with other agencies and considers factors such as the particular circumstances of the proposed transfer, the country to which the transfer is being made, the individual concerned, and any concerns regarding torture or persecution that may arise. *Id.* (citing Waxman Decl. ¶ ¶ 6-7 & Declaration of Pierre-Richard Prosper dated March 8, 2005 ("Prosper Decl.") ¶ ¶ 6-8). [FN5] Moreover, the respondents declare that the "United States seeks humane treatment assurances whenever continued detention is foreseen after transfer and pursues more specific assurances where circumstances warrant, including assurance of access to monitor treatment after transfer." *Id.* (citing Waxman Decl. ¶ ¶ 6-8). Thus, the Secretary of Defense approves a transfer with the involvement of senior United States Government officials, including Department of State officials most familiar with international legal standards and the conditions in the countries concerned. *Id.* (citing Waxman Decl. ¶ 7 & Prosper Decl. ¶ ¶ 7-8). Additionally, the respondents maintain that the DoD will not transfer an individual

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

366 F.Supp.2d 72
366 F.Supp.2d 72
(Cite as: 366 F.Supp.2d 72)

Page 5

if any concerns about mistreatment of an individual in his home country or prospective destination country cannot be resolved. *Id.* (citing Waxman Decl. ¶ 7 & Prosper Decl. ¶ 8.)

> FN4. Matthew C. Waxman is the Deputy Assistant of Defense for Detainee Affairs in the Department of Defense. Waxman Decl. ¶ 1.

> FN5. Pierre-Richard Prosper is " the United States Ambassador-at-Large for War Crimes Issues and has supervised the operation of the Department of State Office of War Crimes Issues ... since July 13, 2001." Prosper Decl. ¶ 1. Ambassador Prosper directly advises the Secretary of State and formulates "[United States] policy responses to serious violations of international humanitarian law committed in areas of conflict throughout the world." *Id.*

With respect to the petitioners' speculation that they may be transferred to countries other than their home country of Bahrain, the DoD represents that "of the over [200] transfers, both for release and for continued detention that have occurred over the years so far, those have all been repatriations back to the home country." Transcript of Proceedings on the Petitioners' Motion for Preliminary Injunction held on April 5, 2005 ("Tr.") at 24. Thus, the likelihood that the petitioners will be sent to a country other than their home country of Bahrain seems highly improbable. And, the petitioners' counsel represented during the hearing on their motion that if the requested notices indicate that their clients would be transferred to Bahrain, "it is certainly more likely that there would be no further litigation." Tr. at 29. Moreover, the DoD maintains that even if the petitioners are transferred to third countries other than Bahrain, "all of [the same factors considered in a transfer to petitioners' home country] would be taken into account and [would be considered] in[ ] the Executive's ultimate decision as to whether a transfer would ultimately be appropriate." Tr. at 25.

[3][4] As previously stated, irreparable harm to the moving party is "the basis of **\*78** injunctive relief in the federal courts." *CityFed Fin. Corp.,* 58 F.3d at 747 (quoting *Sampson v. Murray,* 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)). To obtain injunctive relief, the petitioners must show that the threatened injury is not merely "remote and speculative." *Milk Indus. Found. v. Glickman,* 949 F.Supp. 882, 897 (D.D.C.1996). Here, the petitioners

have failed to show that their threatened injuries are not remote and speculative. Namely, they extensively rely on news reports and articles that suggest that the government is involved in a conspiracy to ship the Guantánamo Bay detainees to countries where they will be tortured and detained indefinitely at the behest of the United States. Moreover, there is no evidence in the record that supports the petitioners' allegations that they will be transferred to any country other than Bahrain or that they will be detained by the authorities in Bahrain if and when they are released by the United States. Additionally, the petitioners have not submitted any evidence that could lead this Court to conclude that the representations made by the DoD with respect to the transfer process are not true. To the contrary, the DoD has submitted declarations of high-level officials outlining the process by which transfers are made, along with assurances that detainees will not be subjected to torture, mistreatment, or indefinite detention at the behest of the United States.

It is clear that the underlying basis for the claims advanced by the petitioners is their basic distrust of the Executive Branch. And, the predicate for their distrust is based on nothing more than speculation, innuendo and second hand media reports. This is not the stuff that should cause a court to disregard declarations of senior Executive Branch officials submitted to the Court "under the penalty of perjury." Nor is the Court prepared to conclude, as the petitioners suggest, that the respondents are not doing what they indicate in their declarations submitted to this Court in the absence of evidence to the contrary. Thus, because the respondents directly refute the petitioners' allegations of their potential torture, mistreatment and indefinite detention to which the United States will in some way be complicit, this Court cannot conclude, on this record, that the petitioners would suffer irreparable harm if they are transferred from the Guantánamo Bay facility.

With respect to petitioners' position that they will sustain irreparable harm as a result of this Court losing jurisdiction over their habeas petitions upon their transfers, the DoD responds that because "the courts have habeas jurisdiction to consider claims by detainees that [their] present custody by the United States is unlawful, does not carry with it the necessary corollary that the courts should stand in the way of decisions by the United States to end that custody in appropriate circumstances." Resp'ts' Opp'n at 12. They further contend that "[i]f the Executive determines, for whatever reason, that the Nations's security no longer requires it to detain a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

366 F.Supp.2d 72
366 F.Supp.2d 72
**(Cite as: 366 F.Supp.2d 72)**

particular individual, then the obvious and natural thing to do is to end the detention." *Id.* at 13. On the other hand, the petitioners maintain that the "[r]espondents should not be permitted to transfer [them] without [advance] notice and an opportunity to be heard by the detainee because to do so would prevent a[p]etitioner from vindicating his legal rights." Reply Memorandum of Law in Support of Motion for Preliminary Injunction Enjoining Respondents from Transfer of Petitioners from Guantánamo Bay Without Advance Notification to Counsel ("Pets.' Reply") at 6.

The ultimate objective of a habeas petition is release from custody. "The writ of *79 habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action." *Harris v. Nelson,* 394 U.S. 286, 290-91, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969); *Abu Ali,* 350 F.Supp.2d at 30 (citing *United States v. Morgan,* 346 U.S. 502, 506 n. 3, 74 S.Ct. 247, 98 L.Ed. 248(1954) (quotation omitted)) ("The writ of habeas corpus commands general recognition as the essential remedy to safeguard a citizen against imprisonment by State or Nation in violation of his constitutional rights."). As the Supreme Court reiterated in *Rasul,* "at its core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, ..." *Rasul,* 542 U.S. at ----, 124 S.Ct. at 2692 (quoting *INS v. St. Cyr,* 533 U.S. 289, 301, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (citing *Brown v. Allen,* 344 U.S. 443, 533, 73 S.Ct. 397, 97 L.Ed. 469 (1953) (Jackson, J., concurring in result) ("The historic purpose of the writ has been to relieve detention by executive authorities without judicial trial.")))

[5] Here, the respondents represent that "[w]hen the [DoD] transfers detainees to the control of other governments, the detainees are no longer subject to the control of the United States ...." Resp'ts' Opp'n at 8. Indeed, "[i]n order to maintain a habeas corpus action, the petitioner must be 'in custody.' " *Abu Ali,* 350 F.Supp.2d at 47 (quoting *Steinberg v. Police Court of Albany, N.Y.,* 610 F.2d 449, 453 (6th Cir.1979)). And the "custody must be the result of the respondent's action from which [a detainee] seeks habeas corpus relief." *Id.* Although the Supreme Court has attached a liberal construction to the custody requirement for purposes of habeas corpus, for example, finding it unnecessary for a petitioner to be in actual physical control of the respondent to be considered in the respondent's custody, for a sovereign to be considered in custody of a person over whom it does not exercise "physical control," a

court must be able to conclude that the sovereign is in "actual or constructive custody" of the petitioner "within the meaning of the habeas statute" as a result of the respondent being "responsible for significant restraints on the petitioner's liberty." *Id.* at 48 (citing *Hensley v. Mun. Court,* 411 U.S. 345, 351, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973) ("The custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty") (additional citation omitted)). And such a finding can be made if a respondent is "working through an intermediary or an agent to detain [a] prisoner." *Id.* At bottom, as the Sixth Circuit has stated:

> In order to maintain a habeas corpus action, the petitioner must be "in custody." His custody must be the result of the respondent's action from which he seeks habeas corpus relief ... It is enough that the imprisoning sovereign is the respondent's agent; that his liberty is restrained by ... conditions [imposed by the respondent]; or that he can point to some continuing collateral disability which is the result of the respondent's actions.

*Steinberg,* 610 F.2d at 453 (citations omitted). Nothing of this sort has been demonstrated by the petitioners here. Accordingly, this Court is compelled to conclude that the petitioners have failed to establish that they will be irreparably harmed if and when the respondents decide to transfer them from United States custody.

**B. Substantial Likelihood of Success on the Merits**

[6] The petitioners claim that they are likely to succeed on the merits because "Judge Green has already ruled that Petitioners have stated actionable claims under *80 the Due Process Clause ..." [FN6] Pets.' Mem. at 8. According to the petitioners, "[f]or the respondents to move petitioners to countries that would afford no such protections would be to flout Judge Green's ruling and defeat the Court's jurisdiction." *Id.* Additionally, the petitioners claim that "[a]ny such transfer would also violate basic international legal norms embodied not only in the Geneva Conventions, but also in the International Covenant on Civil and Political Rights and the Convention Against Torture and Other Cruel and Degrading Treatment and Punishment." *Id.*

> FN6. Judge Green, in recognizing that the petitioners have protection under the Due Process Clause of the Fifth Amendment, stated:
>> there can be no question that the Fifth

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Amendment right asserted by the Guantánamo detainees in this litigation--the right not to be deprived of liberty without due process of law--is one of the most fundamental rights recognized by the U.S. Constitution. In light of the Supreme Court's decision in _Rasul,_ it is clear that Guantánamo Bay must be considered the equivalent of a U.S. territory in which fundamental constitutional rights apply. _In re Guantanamo Detainee Cases,_ 355 F.Supp.2d at 464. However, Judge Green's analysis of the detainees entitlement to due process was specifically limited to its application "to the government's determinations that [the detainees] are 'enemy combatants.'" _Id._ at 465. Moreover, Judge Green's ruling with respect to the potential violations of the Geneva Convention was restricted to detainees who were "Taliban Fighters." _Id._ at 479. The petitioners do not allege that they are Taliban detainees and therefore Judge Green's ruling concerning potential Geneva Convention violations does not apply to them.

The petitioners posit, however, that pursuant to the All Writs Act "the Court has the inherent power 'to issue injunctions to protect its jurisdiction.'" Pets.' Mem. at 7 (citing _SEC v. Vision Communications, Inc.,_ 74 F.3d 287, 291 (D.C.Cir.1996); _Envtl. Def. Fund v. EPA,_ 485 F.2d 780, 784 n. 2 (D.C.Cir.1973)). And the petitioners assert that their "request meets the most fundamental purpose of preliminary injunctive relief, 'to preserve the status quo between the parties pending a final determination of the merits of the action.'" _Id._ However, the All Writs Act becomes inapplicable once the respondents release the petitioners from United States custody because they will have obtained the result requested and at that point there will be no further need for this Court to maintain jurisdiction. Nonetheless, even though the petitioners are seeking habeas relief, [FN7] they also now desire to have their release delayed for thirty days even if the respondents are affording them what they profess they want. Such delay conflicts with the purpose for seeking habeas relief, in the absence of proof that the release is a sham and that control over a petitioner is in some manner being retained by the respondents. Indeed, "[t]he custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty." _Abu Ali,_ 350 F.Supp.2d at 48 (quoting

_Hensley,_ 411 U.S. at 351, 93 S.Ct. 1571); _see also Poodry v. Tonawanda Band of Seneca Indians,_ 85 F.3d 874, 894 (2d Cir.1996) (habeas jurisdiction exists not just in physical custody by the executive but in all circumstances in which "federal adjudication is necessary to guard against governmental abuse in the imposition of severe restraints on individual liberty"). Thus, it is abundantly clear that the habeas statute requires that the petitioner be in custody for this Court to exercise jurisdiction. _See_ 28 U.S.C. § 2241(c).

> FN7. Although the petitioners seek other relief, none of the additional relief requested has bearing on whether restrictions should be imposed on the respondents' authority to transfer the petitioners from United States custody.

Here, if and when any of the petitioners are unconditionally released from United *81 States custody, this Court will be divested of its habeas jurisdiction as to such respondent. And if thereafter a respondent remains in custody in the country to which he is transferred, such "subsequent confinement in the receiving country [will be] a function of the receiving government's law enforcement or prosecution interest or other reasons based on the domestic law of the receiving government." Resp'ts' Opp'n at 8 (citing Waxman Decl. ¶ 5). This reality is not altered by the petitioners' purely speculative and unsupported argument that the respondents are releasing them for the purpose of stripping this Court of its jurisdiction, in the face of the respondents' declaration that "there [is no] plan to effect transfers of GTMO detainees in order to thwart the actual or putative jurisdiction of any court with respect to the detainees." Resp'ts' Opp'n, Second Declaration of Matthew C. Waxman dated March 16, 2005 ¶ 4. Thus, on the record currently before this Court, the All Writs Act does not provide a basis for this Court to interfere with the respondents' prerogative to release any of the petitioners once they decide that the petitioners' detention by the United States is no longer necessary. Thus, the petitioners are unlikely to succeed on their claim that this Court has authority, pursuant to the All Writs Act, to delay the respondents' transfer to another country once a decision for release is made by the respondents.

To conclude otherwise would violate the separation of powers doctrine. In the context of the situation now before the Court, requiring the respondents to provide notice as requested prior to carrying out the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

366 F.Supp.2d 72
366 F.Supp.2d 72
(Cite as: 366 F.Supp.2d 72)

transfer of the detainees from Guantánamo Bay on the record before it, would be tantamount to an unconstitutional encroachment on the authority of the Executive Branch to determine when it should continue to detain an individual it has no further interest in detaining. This Court simply does not have authority to require the Executive Branch to provide thirty day notices prior to effecting the transfer of the petitioners. As noted above, it is a fundamental principle under our Constitution that deference to the Executive Branch must be afforded in maters concerning the military and national security matters. *Hamdi,* 542 U.S. at ----, 124 S.Ct. at 2647 (citing *Egan,* 484 U.S. at 530, 108 S.Ct. 818 (noting the reluctance of the courts to "intrude upon the authority of the Executive in military and national affairs") (additional citations omitted)). Accordingly, because this Court does not have the authority to grant the relief requested, the petitioners have failed to satisfy the likelihood of success prong of the preliminary injunction standard.

## C. Substantial Injury to Other Interested Parties

[7] In deciding whether to award injunctive relief, the Court must assess whether issuing an injunction would substantially injure other interested parties. The respondents state that "the presence of an injunction, ... in the form of ... an advance-notice requirement to set the stage for future judicial intervention, would 'result in considerable harm to the United States and to the public interest.' " Resp'ts' Opp'n at 22. According to the respondents, such "intervention in transfer and repatriation decisions would prevent the United States from speaking with one voice in its dealings with foreign governments, particularly when such intervention, as here, would be by as many as 14 different Judges in scores of cases." *Id.* The respondents also allege, *inter alia,* that an injunction "would cause foreign governments to become reluctant to communicate frankly with the United States concerning particular mistreatment or torture concerns ... [,]" as well as encumber **\*82** and delay an already elaborate process leading up to transfers or repatriations. *Id.* at 22-23 (citing Waxman Decl. ¶ 8 & Prosper Decl. ¶ ¶ 9- 10 & 12). Additionally, according to the respondents, an injunction would "undermine the United States' ability to reduce the number of individuals under [its] control and [its] effectiveness in eliciting the cooperation of other governments in the war on terrorism." *Id.* at 23 (citing Waxman Decl. ¶ 8 & Prosper Decl. ¶ 12). These are "weighty and sensitive governmental interests," *see, Hamdi,* 542 U.S. at ----, 124 S.Ct. at 2647, that surely trump the

petitioners' interests concerning why they should not be transferred without advance notice, which as discussed above are based on innuendo, speculation and second hand media reports. As such, the third prong of the preliminary injunction standard weighs in favor of the respondents.

## D. Public Interest

Finally, the Court must consider whether granting the requested injunction implicates the public interest and whether it confers a benefit or produces harm. *Milk Indus.* 949 F.Supp. at 897. The petitioners contend that "public policy favors requiring [r]espondents to provide advance notice to counsel and the Court of any intended removal of any petitioner from the Court's jurisdiction." Pets.' Mem. at 8. They contend that "[n]o matter how satisfied the Executive Branch may be that its actions are lawful, the public good requires that a federal litigant-- properly before the Court and represented by counsel--be provided with a meaningful opportunity to contest his transfer into the hands of those who might torture him or detain him indefinitely." *Id.* On the record before the Court, it is abundantly clear that the respondents have demonstrated that they have no intention of transferring the petitioners into the hands of those who might torture them, or to have them further detained on behalf of the United States following any transfers. Rather, the respondents have established that the United States will act in compliance with its transfer and repatriation policy, which comports with the principles of the Convention Against Torture, as detailed in the declarations submitted by the respondents. Pets.' Mem. at 8 & Waxman Decl. ¶ 8.

## IV. Conclusion

For the foregoing reasons, this Court concludes that the Petitioners' Motion for Preliminary Injunction must be denied. To conclude otherwise, would amount to an unconstitutional infringement on the Executive Branch's authority to assess the propriety of when designated enemy combatants in the United States' ongoing battle against terrorism should be released. This conclusion is compelled because on the record put before the Court, the separation of powers doctrine precludes the Court from granting the relief requested by the petitioners.

### ORDER

In accordance with the Memorandum Opinion being issued contemporaneously herewith, it is hereby

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

366 F.Supp.2d 72
366 F.Supp.2d 72
**(Cite as: 366 F.Supp.2d 72)**

**ORDERED** that the Petitioners' Motion for Preliminary Injunction [D.E. # 101] is Denied. It is further

**ORDERED** that upon the transfer or repatriation of any petitioner, the respondents shall submit a declaration to this Court certifying that any transfers or repatriations were not made for the purpose of merely continuing the petitioners' detention on behalf of the United States or for the purpose of extinguishing this Court of jurisdiction over the petitioners' actions for habeas relief for a reason unrelated to the decision that the petitioners' detention **\*83** is no longer warranted by the United States.

366 F.Supp.2d 72

**Motions, Pleadings and Filings (Back to top)**

•        1:04cv01227              (Docket) (Jul. 22, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit T

Westlaw.

370 F.Supp.2d 188                                                          Page 1
370 F.Supp.2d 188
(Cite as: 370 F.Supp.2d 188)

C

**Motions, Pleadings and Filings**

United States District Court,
District of Columbia.
Abdulla Thani Faris **AL-ANAZI**, et al., Petitioners,
v.
George W. **BUSH**, et al., Respondents.
**Civ.A. No. 05-0345(JDB).**

April 21, 2005.

**Background:** In habeas proceeding brought by
foreign nationals detained in Guantanamo Bay
military prison, detainees moved for a preliminary
injunction requiring government to give detainees'
counsel thirty days' notice prior to
transferring the detainees to any location outside the
United States.

 **Holding:** The District Court, Bates, J., held that
detainees were not entitled to preliminary injunction.
Motion denied.

West Headnotes

**[1] Injunction** ⚎138.1
212k138.1 Most Cited Cases
To prevail on a motion for a preliminary injunction,
petitioners must demonstrate: (1) a substantial
likelihood of success on the merits, (2) that they will
suffer irreparable harm absent the relief requested,
(3) that other interested parties will not be harmed if
the requested relief is granted, and (4) that the public
interest supports granting the requested relief.

**[2] Injunction** ⚎132
212k132 Most Cited Cases
Because preliminary injunctions are extraordinary
forms of judicial relief, courts should grant them
sparingly.

**[3] Habeas Corpus** ⚎678.1
197k678.1 Most Cited Cases

**[3] War and National Emergency** ⚎11
402k11 Most Cited Cases
        (Formerly 212k138.60)
Detainees who brought habeas proceeding to

challenge their detention in military facility were not
entitled to preliminary injunction requiring thirty
days' notice of their transfer to foreign countries; no
legal provision prohibited transfer of wartime
detainees to other countries and there was no
evidence that Department of Defense (DOD) was
transferring detainees to foreign countries for any
illicit purpose, and petitioners' foreign relations
would be impeded by potential judicial inquiries.

**[4] Habeas Corpus** ⚎679
197k679 Most Cited Cases
In the interest of judicial economy and avoiding
unnecessary litigation, stay, pending resolution of
appeals in similar cases, was warranted in habeas
proceeding brought by foreign nationals being
detained in military prison facility.

**[5] Habeas Corpus** ⚎688
197k688 Most Cited Cases
Government would be required to produce factual
returns regarding foreign nationals being detained in
military prison facility at Guantanamo Bay; returns
were necessary for detainees' counsel effectively to
represent the detainees in their habeas proceeding.
**\*189** David A. Hickerson, Weil, Gotshal & Manges,
L.L.P., Washington, DC, for petitioners.

 Terry Marcus Henry, U.S. Department of Justice,
Civil Division, Washington, DC, for respondents.

*MEMORANDUM OPINION*

BATES, District Judge.

 Petitioners Abdulla Thani Faris Al-Anazi, Adel Egla
Hussan Al-Nussairi, N.A.O., [FN1] Abdulaziz Sa'ad
Oshan, and Ibrahim Suleiman Al-Rubaish
(collectively the "petitioners") have filed a petition
for a writ of habeas corpus challenging the legality of
their detention by the United States at the United
States Naval Station at Guantanamo Bay, Cuba
("Guantanamo"). Presently before the Court is
petitioners' motion for a preliminary injunction
pursuant to Fed.R.Civ.P. 65 and the All Writs Act, 28
U.S.C. § 1651, which as it has evolved now seeks an
order requiring respondents to provide petitioners'
counsel with 30-days' notice of any proposed transfer
of petitioners from Guantanamo to any location
outside of the United States. For the reasons that
follow, the Court denies petitioners' motion. [FN2]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.Supp.2d 188
370 F.Supp.2d 188
**(Cite as: 370 F.Supp.2d 188)**

FN1. Petitioner N.A.O. was a minor at the time he was first detained at Guantanamo, and hence is referred to by his initials only.

FN2. Several other issues are also before the Court, including respondents' motion to stay proceedings. Those issues will be addressed in this opinion as well.

## BACKGROUND

### I. Procedural History

Petitioners have been detained by the United States at Guantanamo for approximately the last three years. On February 17, 2005, they filed a petition for a writ of habeas corpus in this Court seeking, among other forms of relief, their release from the custody of the United States. This petition is similar to many others filed *190 by Guantanamo detainees in the United States District Court for the District of Columbia both before and since the Supreme Court held in _Rasul v. Bush_, 542 U.S. 466, 124 S.Ct. 2686, 2698, 159 L.Ed.2d 548 (2004), that the federal habeas statute "confers on the District Court jurisdiction to hear petitioners' habeas corpus challenges to the legality of their detention at the Guantanamo Bay Naval Base."

Late last year, eleven petitions advancing the claims of several dozen detainees were consolidated for further proceedings before Judge Joyce Hens Green, including a petition assigned to this judge, _O.K. v. Bush_, No. 04-CV-1136. On January 31, 2005, Judge Green granted in part and denied in part the government's motion to dismiss, holding that the Guantanamo detainees before her possessed constitutional and other legal grounds to challenge their detention. _See In re Guantanamo Detainee Cases_, 355 F.Supp.2d 443, 481 (D.D.C.2005). Almost simultaneously, on January 19, 2005, Judge Richard Leon of this Court granted the government's motion to dismiss the habeas petitions of two other Guantanamo detainees, concluding that there was no constitutional or other basis to challenge their detention. _See Khalid v. Bush_, 355 F.Supp.2d 311, 314 (D.D.C.2005). Those cases have been consolidated on appeal before the United States Court of Appeals for the District of Columbia Circuit. On February 3, 2005, Judge Green issued a stay in the eleven consolidated cases pending the appeal.

### II. Transfers From Guantanamo

On March 17, 2005, petitioners filed a motion for preliminary injunction. Although originally framed as an attempt to enjoin respondents from effectuating the transfer of petitioners from Guantanamo, the motion is now confined to the alternative request that respondents provide 30-days' notice (once a transfer has been decided) before a transfer actually occurs. The motion appears to have been prompted by a number of newspaper articles recently published about the transfer of detainees. Petitioners rely most heavily on an article in the March 11, 2005, edition of the New York Times reporting that the Pentagon is seeking to enlist the assistance of other departments in the United States government "in a plan to cut by more than half the population at its detention facility in Guantanamo Bay, Cuba, in part by transferring hundreds of suspected terrorists to prisons in Saudi Arabia, Afghanistan and Yemen, according to senior administration officials." Douglas Jehl, _Pentagon Seeks to Shift Inmates from Cuba Base,_ N.Y. Times, Mar. 11, 2005, at A1.

Petitioners also cite articles discussing an alleged practice known as "rendition." Under this procedure, the Central Intelligence Agency ("CIA") allegedly transfers foreign nationals from one country to another, where the receiving governments are expected to carry out the will of the United States. In one article, a former detainee alleged that prior to being moved to Guantanamo, he had been transferred to Egypt and questioned there by United States officials. _See_ Megan K. Stack and Bob Drogin, _Detainee Says U.S. Handed Him Over for Torture,_ L.A. Times, Jan. 13, 2005, at A1. Petitioners also cite an article discussing the case of a Syrian-born Canadian citizen who alleged that he was detained by the United States at Kennedy Airport immediately following September 11, 2001, and then transported to Syria, where he was interrogated and tortured before being released and returned to Canada. _See_ Pet'rs' Mem. ¶ 7; Douglas Jehl and David Johnson, _Rule Change Lets CIA Freely Send Suspects Abroad,_ N.Y. Times, Mar. 6, 2005, at A1. Petitioners concede that none of these incidents involve the transfer of detainees out of *191 Guantanamo. _See_ Transcript of Motions Hearing ("Tr.") at 12:20-13:5 (April 13, 2005). Even the New York Times article on which they place the greatest weight notes the distinction between Guantanamo transfers and CIA rendition:

Unlike the Pentagon, the C.I.A. was authorized by President Bush after the Sept. 11 attacks to transfer prisoners from one foreign country to another without case-by-case approval from other government departments. Former intelligence officials said that the C.I.A. has carried out 100 to 150 such transfers, known as renditions, since Sept.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 3

11. By contrast, the transfers carried out by the Pentagon are subject to strict rules requiring intraagency approval. Officials said that the transfers do not constitute renditions under the Pentagon's definition, because the government that accept the prisoners are not expected to carry out the will of the United States.
*Id.*

In response to petitioners' claims, respondents have submitted to the Court declarations from two high-ranking Department of Defense and Department of State officials describing the procedures that govern the detention and transfer of Guantanamo detainees. *See* Decl. of Matthew C. Waxman ("Waxman Decl."); Second Decl. of Matthew C. Waxman ("Second Waxman Decl."); Decl. of Pierre-Richard Prosper ("Prosper Decl."). The officials state that the United States has no interest in detaining the 540 foreign nationals presently at Guantanamo any longer than necessary, and that the Department of Defense ("DOD") therefore conducts at least an annual review of whether each detainee merits continued detention. Waxman Decl. ¶ 3.

The officials further explain that when detention is no longer deemed necessary, the DOD may transfer the detainee to the control of another country with the understanding that the country will release the individual. *Id.* Where the "appropriate conditions" exist, the DOD will also transfer detainees "to the control of other governments for investigation and possible prosecution and continued detention when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not continue to pose a threat to the United States and its allies." *Id.* Such governments can include the government of a detainee's home country, or a country other than the detainee's home country that may have law enforcement or prosecution interest in the detainee. *Id.*

As of April 13, 2005, two hundred and fourteen (214) detainees had been transferred from Guantanamo. *Id.*; Second Waxman Decl. ¶ 2. Of those, one hundred forty-nine (149) were transferred for release and sixty-five (65) were transferred for continued custody. Waxman Decl. ¶ 4; Second Waxman Decl. ¶ 2. [FN3] Each of the 65 detainees transferred for custody has been transferred to his home government. *Id.* ¶ 4. Most of those 65 have subsequently been released as well. *Id.* ¶ 5. Respondents also indicated at the April 13, 2005 motions hearing that some detainees transferred for

release have in fact been detained by their home governments. In the cases where a detainee is transferred for continued detention by the detainee's home government, DOD "does not ask or *192 direct the receiving government to detain the individual on behalf of the United States," and "the detainees are no longer subject to the control of the United States once they are transferred." *Id.*

FN3. An April 19, 2005 DOD News Release indicates that an additional 18 detainees were recently transferred for release, bringing the total to two hundred thirty-two (232) transferred and one hundred sixty-seven (167) transferred for release. *See* Department of Defense, *Detainee Transfer Announced,* Apr. 19, 2005, *available at* http://www.defenselink.mil/releases/2005/nr20050419-2661.html (last visited April 20, 2005).

Once a transfer is proposed, DOD consults other interested parties in the United States government, and in particular the Department of State. *Id.* ¶ 6. The Department of State is responsible for initiating discussions with the foreign government regarding transfer. Prosper Decl. ¶ 6. The purpose of these discussions is to learn the measures that the foreign government will take to ensure the detainee does not pose a continuing threat to the United States or its allies, and to receive appropriate assurances regarding the transfer. *Id.* The necessary assurances include assurances that the detainee will be humanely treated in accordance with international obligations. *Id.* If the foreign government is a party to the relevant treaties, i.e., the Torture Convention, the Department of State will pursue further assurances. *Id.*

Decisions regarding assurances from a foreign government are made on a case-by-case basis, considering the particular circumstances of the transfer, country, and individual involved and concerns regarding possible torture and persecution. *Id.* ¶ 7. The essential question in evaluating the assurances regarding treatment of a detainee proposed for transfer is whether the Department of State officials "believe it is more likely than not that the individual will be tortured in the country to which he is being transferred." *Id.* ¶ 8. When making this determination, the United States considers the identity, position, and information concerning the official providing the assurances, as well as political or legal developments in the country. *Id.* The Department of State also considers the United States diplomatic relations with the foreign government in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.Supp.2d 188
370 F.Supp.2d 188
**(Cite as: 370 F.Supp.2d 188)**

assessing the sufficiency of assurances received, and will in some instances seek access to the individual by governmental and non-governmental entities in the foreign country in order to monitor the individual's return. *Id.* In the past, DOD has decided against the transfer of detainees because of concerns about torture in countries of origin. Waxman Decl. ¶ 7.

On the basis of their newspaper articles, and notwithstanding respondents' declarations, petitioners have asked this Court to issue a preliminary injunction ordering respondents to provide 30-days' notice prior to any transfer of a petitioner from Guantanamo. Because such advance notice would be provided only after DOD has decided to transfer a detainee, petitioners concede, as they must, that they are essentially requesting an order preventing the United States from transferring any Guantanamo detainee for 30 days. *See* Tr. at 4:1-4:15. Other Guantanamo detainees have filed similar motions for preliminary injunctions before other judges in this District seeking notice prior to any transfer from Guantanamo. Generally, other judges have ordered some form of the requested 30-days' notice, either by granting the motion for preliminary injunction, *see Abdah v. Bush,* No. 04- CV-1254, 2005 WL 711814 (HHK) (March 29, 2005 Order); *Al-Joudi v. Bush,* No. 05-CV-0301, 2005 WL 774847 (GK) (April 4, 2005 Order), by including the 30- days' notice as a condition of granting respondents' motion to stay the case, *see Abdullah v. Bush,* No. 05-CV-0023 (RWR) (March 16, 2005 Order), or by requiring the 30-days' notice pursuant to the All Writs Act, *see Ameziane v. Bush,* No. 05-CV-0392, 2005 WL 839542 (ESH) (April 12, 2005 Order). In one other case, *Almurbati v. Bush,* 366 F.Supp.2d 72 (D.D.C.2005) (April 14, 2005 Order), the court denied the requested 30-days' notice. In addition to the motion for a preliminary injunction, also before the **\*193** Court are respondent's motion to stay and petitioners' requests for an order to show cause, entry of a protective order, [FN4] and issuance of factual returns.

> FN4. Neither party opposes the entry of protective orders identical to those entered by Judge Green in the cases consolidated before her.

### LEGAL STANDARD

[1] To prevail on their motion for a preliminary injunction, petitioners must demonstrate (1) a substantial likelihood of success on the merits; (2) that they will suffer irreparable harm absent the relief requested; (3) that other interested parties will not be harmed if the requested relief is granted; and (4) that the public interest supports granting the requested relief. *Cobell v. Norton,* 391 F.3d 251, 258 (D.C.Cir.2004); *Katz v. Georgetown Univ.,* 246 F.3d 685, 687-88 (D.C.Cir.2001); *Taylor v. Resolution Trust Corp.,* 56 F.3d 1497, 1505-06 (D.C.Cir.1995); *Washington Area Metro. Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977). In determining whether to grant urgent relief, a court must "balance the strengths of the requesting party's arguments in each of the four required areas." *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C.Cir.1995). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Id.* It is particularly important for petitioners to demonstrate a substantial likelihood of success on the merits; where a plaintiff cannot show a likelihood of success on the merits, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiff['s] favor." *Davenport v. Int'l Bhd. of Teamsters, AFL-CIO,* 166 F.3d 356, 366-67 (D.C.Cir.1999); *Nat'l Head Start Ass'n v. Dep't of Health and Human Servs.,* 297 F.Supp.2d 242, 246 (D.D.C.2004) (factors "must be balanced against each other, but it is especially important for the movant to demonstrate a likelihood of success on the merits"). [FN5]

> FN5. The test for a stay or injunction pending appeal is essentially the same, *see United States v. Philip Morris, Inc.,* 314 F.3d 612, 617 (D.C.Cir.2003) (citing *Holiday Tours,* 559 F.2d at 843), although courts often recast the likelihood of success factor as requiring only that the movant demonstrate a serious legal question on appeal where the balance of harms strongly favors a stay, *see Holiday Tours,* 559 F.2d at 844 ("fair ground for litigation" or "serious legal question"). *See generally Cuomo v. United States Nuclear Reg. Comm'n,* 772 F.2d 972, 978 (D.C.Cir.1985) (movant must in any event justify the extraordinary remedy).

[2] Because preliminary injunctions are extraordinary forms of judicial relief, courts should grant them sparingly. *Sociedad Anonima Vina Santa Rita v. United States Dep't of the Treasury,* 193 F.Supp.2d 6, 13 (D.D.C.2001); *see Dorfmann v. Boozer,* 414 F.2d 1168, 1173 (D.C.Cir.1969). The Supreme Court has stated that " '[i]t frequently is observed that a preliminary injunction is an

370 F.Supp.2d 188
370 F.Supp.2d 188
**(Cite as: 370 F.Supp.2d 188)**

Page 5

extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997); *accord Cobell,* 391 F.3d at 258.

### *ANALYSIS*

### I. Motion for 30-Days' Notice

#### A. Substantial Likelihood of Success on the Merits

[3] Petitioners argue that they have a substantial likelihood of succeeding on the merits of their claims because Judge Green has already denied respondents' motion to dismiss in the consolidated habeas petitions challenging the legality of their detention at Guantanamo. The Court agrees that the appeals from Judge **\*194** Green's and Judge Leon's decisions raise at least a serious question of law. However, the presence of a sound basis to challenge the legality of one's *detention* does not at all imply that there exists a sound basis to challenge the legality of one's *transfer*. Put differently, the "merits", if you will, to be assessed for purposes of the present claim for preliminary injunctive relief, is petitioners' challenge to their *transfer* from Guantanamo, not to their *detention* at Guantanamo.

Petitioners have not come forward with any legal authority that can be read to prohibit the transfer of Guantanamo detainees to a foreign country; any evidence that the United States is transferring Guantanamo detainees to foreign countries for an illicit purpose; or any reason to doubt the statements in the sworn declarations of high-level Department of Defense and Department of State officials that the United States relinquishes control of the detainees upon transfer to the foreign state and obtains all assurances necessary under the law from the foreign state that the detainee will be treated humanely upon transfer.

Petitioners contend that because they may face torture by a foreign state upon transfer, an injunction should issue. However, they do not identify a single legal provision that prohibits or even limits the transfer of wartime detainees to other countries. They reference in their papers the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub.L. No. 105-277, § 2242, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note), which states that it "shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." FARRA § 2242(a). However, FARRA also expressly states that this "policy" shall not be "construed as providing any court jurisdiction to consider or review claims raised under the Convention [Against Torture] [FN6] or this section ... except as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act." *Id.* § 2242(d). Petitioners do not attempt to explain how this language is consistent with the recognition of binding rights under FARRA outside of the context of a final order of removal. *See, e.g., Cornejo-Barreto v. Siefert,* 379 F.3d 1075, 1086 (9th Cir.2004) ("While § 2242(d) plainly contemplates judicial review of final orders of removal for compliance with the Torture Convention and the FARR Act, it just as plainly does not contemplate judicial review for anything else."), *vacated as moot,* 389 F.3d 1307 (9th Cir.2004) (en banc).

> FN6. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 46, U.N. GAOR 39th Sess., Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984), reprinted in 23 I.L.M. 1027 (1984).

Counseling even further against judicial interference in the transfer of detainees to other countries is a well-established line of cases in the extradition context holding that courts will not conduct an inquiry into "the procedures or treatment which await a surrendered fugitive in the requesting country." *United States v. Kin-Hong,* 110 F.3d 103, 110 (1st Cir.1997) (quotation omitted). Known as the "rule of non-inquiry," this doctrine is "shaped by concerns about institutional competence and by notions of separation of powers," and stands for the general proposition that "it is the function of the Secretary of State--not the courts--to determine whether extradition should be denied on humanitarian grounds." *Kin-Hong,* 110 F.3d at 110; *Sidali v. INS,* 107 F.3d 191, 195 n. 7 (3d Cir.1997); *see also* **\*195**Ahmad v. Wigen, 910 F.2d 1063, 1067 (2d Cir.1990) ("The interests of international comity are ill-served by requiring a foreign nation ... to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced."); *Escobedo v. United States,* 623 F.2d 1098, 1107 (5th Cir.1980) ("[T]he degree of risk to [Escobedo's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch.") (citations and quotations omitted). The same separation of powers principles

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.Supp.2d 188
370 F.Supp.2d 188
**(Cite as: 370 F.Supp.2d 188)**

underlying the rule of non-inquiry have been applied outside of the non-extradition context to limit judicial review of the treatment of individuals in a foreign state. *See Holmes v. Laird,* 459 F.2d 1211, 1215 (D.C.Cir.1972) ("In situations such as this, the controlling considerations are the interacting interests of the United States and of foreign countries, and in assessing them we must move with the circumspection appropriate when a court is adjudicating issues inevitably entangled in the conduct of our foreign relations.") (citations and quotations omitted); *see also People's Mojahedin Org. v. Dep't of State,* 182 F.3d 17, 23 (D.C.Cir.1999) (holding that foreign policy decisions by the Executive "are political judgments, decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry" (quotation omitted)).

Besides requesting an order to block the transfer on humanitarian grounds, petitioners also invoke the broad authority of the Court under the All Writs Act, on the theory that 30-days' notice (followed by judicial review of the grounds of transfer) is necessary to protect the Court's jurisdiction over petitioners' habeas petitions. *See* Pet'rs' Mem. ¶ ¶ 11-13. Petitioners' concern is that upon transfer for continued detention elsewhere, petitioners would lose their rights to have the legality of their detention adjudicated by this Court. *Id.* ¶ 13.

The All Writs Act empowers a district court to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651; *SEC v. Vision Communications, Inc.,* 74 F.3d 287, 291 (D.C.Cir.1996) (All Writs Act "empowers a district court to issue injunctions to protect its jurisdiction"). Like a motion for a preliminary injunction, the All Writs Act is an extraordinary remedy pursuant to which a court may "enjoin almost any conduct which, left unchecked, would have ... the practical effect of diminishing the court's power to bring the litigation to a natural conclusion." *Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1102 (11th Cir.2004) (quotation omitted); *see also Alabama Great S. Ry. Co. v. Thompson,* 200 U.S. 206, 218, 26 S.Ct. 161, 50 L.Ed. 441 (1906) (federal courts "may and should take such action as will defeat attempts to wrongfully deprive parties of the protection of their rights in those tribunals").

At the outset, there is no evidence in the record that respondents are seeking to thwart this Court's

jurisdiction. Petitioners have provided the Court with no evidence whatsoever that DOD is transferring (or planning to transfer) Guantanamo detainees as a pretext for continuing United States detention in collusion with a foreign state (or on its own) on foreign soil. Respondents have submitted declarations stating emphatically that this is not the practice of DOD. *See* Waxman Decl. ¶ 5 (DOD "does not ask or direct the receiving government to detain the individual on behalf of the United States. Accordingly, the detainees are no longer subject to the control of the United States once they are transferred."); *id.* ¶ 4 ("[T]here [is no] plan to effect transfers of GTMO detainees in order to thwart the actual or putative *196 jurisdiction of any court with respect to the detainees."). [FN7] Even the newspaper articles on which petitioner stake their motion draw a clear distinction between alleged acts of CIA rendition (where the foreign countries are "expected to carry out the will of the United States") and the alleged Guantanamo transfers (where the foreign countries are not "expected to carry out the will of the United States"). *See* Jehl, *supra,* at A1.

> FN7. Of the 232 detainees that have been transferred from Guantanamo as of the date of this opinion, 131 were transferred at least three months prior to the Supreme Court's decision in *Rasul v. Bush* recognizing the jurisdiction of the federal courts over the habeas petitions of Guantanamo detainees, thus casting doubt on petitioners' suggestion that DOD is undertaking a policy of transfer to thwart the jurisdiction of the courts. *See* Department of Defense, *Transfer of Afghani and Pakistani Detainees Complete* (March 15, 2004) *available at* http://www.defenselink.mil/releases/2004/nr20040315-0462.html (last visited April 20, 2005).

More importantly though, there is no justification for issuance of an injunction pursuant to the All Writs Act when petitioners are obtaining the same relief through transfer that they could hope to obtain through habeas. In this case, petitioners have properly invoked this Court's jurisdiction under habeas to determine the legality of their detention. *See Rasul,* 124 S.Ct. at 2698; Pet. at 28. Now, however, petitioners want this Court, pursuant to the All Writs Act, to delay or even block their release so that petitioners can fully adjudicate their habeas petitions. *See* Pet'rs' Mem. ¶ 13. But there is no basis for the Court to maintain its jurisdiction to consider such extraordinary relief when the record shows that petitioners would obtain the same level of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.Supp.2d 188
370 F.Supp.2d 188
**(Cite as: 370 F.Supp.2d 188)**

relief via transfer that they could get from full adjudication of their habeas petition. Were the Court to preserve its jurisdiction over the habeas petitions, and ultimately determine that the United States may no longer detain the petitioners, the parties and the Court would find themselves in precisely the same position in which they find themselves now--with the respondents taking steps to transfer those individuals out of United States control, and the petitioners compelled to come forward with some legal or evidentiary basis to prevent a transfer to an "undesireable" country. If respondents release petitioners now, that in no way prevents the "natural conclusion" of this litigation, i.e., release of petitioners, and therefore there is no basis for this Court to issue an injunction pursuant to the All Writs Act. *See Klay*, 376 F.3d at 1102.

The Court emphasizes that it reaches this result today based on the record with which it is presented-- there is no evidence that DOD is transferring Guantanamo detainees to foreign countries for an illicit purpose, and quite a bit of evidence to the contrary (including petitioners' own newspaper articles and, more importantly, the declarations of high level government officials). [FN8] Respondents indicated at the hearing on petitioners' motion that they share the view of the Court that they have an ongoing obligation to inform the Court if DOD were to begin transferring Guantanamo detainees overseas for continuing *197 United States custody (either on its own or in collusion with a foreign state). On the current record, however, there is simply no basis in law or fact to challenge the transfer of Guantanamo Bay detainees to a foreign country. [FN9]

> FN8. The Court is aware of and sensitive to the fact that petitioners' counsel have not yet had the opportunity to meet with petitioners, and as a more general matter do not have access to the often classified information that would shine light on the detention and possible transfer of petitioners. None of this relieves petitioners of the burden of coming forward with *at least some* information to support their request for the extraordinary relief of a preliminary injunction against the transfer of these detainees. The Court notes that petitioners' counsel indicated at the April 13, 2005 hearing that a meeting with clients will occur after counsel receives the necessary security clearance.

> FN9. Petitioners have cited this Court's

decision in *Abu Ali v. Ashcroft*, 350 F.Supp.2d 28 (D.D.C.2004), in which the Court held that jurisdiction could potentially exist over a habeas petition by a United States citizen detained in a Saudi prison who alleged that he was being held at the behest and ongoing direction of the United States, as an example of a case where the United States was using a foreign intermediary to avoid the jurisdiction of the United States courts. *See* Pet'rs'. Mem. ¶ 9. *Abu Ali* is not particularly instructive here. This Court's decision in *Abu Ali* was at the motion to dismiss stage, where the Court was obliged to accept petitioners' allegations of collusion between the United States and Saudi Arabia as true. *Abu Ali*, 350 F.Supp.2d at 34-35. Here, petitioners bear the heavy burden of proving their entitlement to preliminary injunctive relief. Moreover, the petitioners in *Abu Ali* came forward with a variety of different types of information suggesting United States involvement in the detention, including newspaper articles quoting named United States officials, declarations containing the transcribed text of government documents, and affidavits regarding communications between petitioner's family and Saudi officials. *Id.* at 31-36. Here, petitioners have come forward with no information at all suggesting the collusive transfer of Guantanamo Bay detainees. In addition, although the United States chose not to respond to the evidence proffered by petitioner in that case, *id.* at 37-38, it has produced strong rebuttal evidence here. Finally, unlike the petitioners in this case, the detainee in *Abu Ali* was a United States citizen, a fact that featured prominently in the reasoning of that case. *Id.* at 37-41, 54- 65.

**B. Irreparable harm**

By the same token, petitioners cannot show that they will suffer irreparable harm in the absence of the injunction they seek. The lynchpin of a request for preliminary injunctive relief is a showing of irreparable injury to the movant in the absence of the requested relief. *See Sociedad Anonima*, 193 F.Supp.2d at 13-14. The harm must be concrete and immediate to warrant extraordinary injunctive relief, and vague or speculative injury will not suffice. *See Wisconsin Gas Co. v. Fed. Energy Reg. Comm'n*, 758 F.2d 669, 674 (D.C.Cir.1985) ("the injury must be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.Supp.2d 188
370 F.Supp.2d 188
**(Cite as: 370 F.Supp.2d 188)**

both certain and great; it must be actual and not theoretical"). In short, the threatened injury must be of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm, because injunctions are not intended "to prevent injuries neither extant nor presently threatened, but only merely feared." *Comm. in Solidarity v. Sessions,* *929 F.2d 742, 745-46 (D.C.Cir.1991)* (quotations omitted).

In this case, the evidence presented by petitioners--or the lack thereof-- balanced with the sworn declarations of high level government officials, fails to establish that petitioners face irreparable harm in the absence of 30-days' advance notice of transfer. As indicated earlier, there is no evidence at all that petitioners are being transferred for the purpose of torture or in inappropriate collusion with a foreign government. Although petitioners express concern about how they might be treated by a foreign state if they are transferred, not only have they identified no legal basis for judicial intervention on their behalf to protect them from the treatment of a foreign state, but they also cannot explain how they would be aided by 30-days' notice of transfer. Petitioners indicated at the motions hearing that they are most concerned about the possibility of United States involvement in the ongoing detention or torture of transferred detainees, but they do not explain how they could possibly obtain any evidence suggesting that was the plan of the United States in the 30-day window they would have before **\*198** a transfer. To the extent that notice would therefore in reality be a precursor as a matter of course to an objection to transfer and months of discovery into the intent of the United States and the foreign states then the substantial injury to the government (discussed below) becomes all the more pronounced in weighing the respective harms to the parties.

To be sure, if the United States were transferring detainees abroad specifically to thwart this Court's jurisdiction, that might establish irreparable harm. But petitioners would have to provide some evidence of such conduct, for example by showing that detainees were being transferred to other countries at the behest of, and to serve the interests of, the United States. This they have not done. Moreover, as discussed above, petitioners have not shown how they would be harmed by an alleged loss of jurisdiction. Every habeas petition, including this one, is ultimately about obtaining release from detention, *see Rasul,* 124 S.Ct. at 2692, and where, as here, the United States will relinquish custody of the detainee to the home government there is nothing more the Court could provide to petitioners. [FN10]

> FN10. This Court has no authority to prevent a foreign sovereign from pursuing an independent law enforcement action against a detainee, or to order the United States to transfer a detainee to the country of his choosing. Such matters involve diplomatic and foreign policy considerations, which are generally the exclusive purview of the Executive.

Petitioners' showing of irreparable harm is thus highly speculative and well short of the necessary certainty for the issuance of a preliminary injunction. *See Wisconsin Gas Co.,* 758 F.2d at 674. At its core, the alleged irreparable harm is founded on fear and mistrust. It may be understandable for petitioners and their counsel to mistrust the Executive, but this Court cannot rule based on petitioners' speculation, innuendo, and mistrust. The role of the judiciary is a simple one--determine facts and apply the law to those facts to reach a decision. The Court will not abdicate that fundamental role here. On the record before the Court, and the applicable legal standard, petitioners have not established the requisite threat of irreparable harm.

### C. Harm to Respondents

The third prong of the preliminary injunction test considers the harm that injunctive relief would impose on other interested parties. *See Cobell,* 391 F.3d at 258. Respondents have explained that the notice, and the judicial review of the transfer that would follow, would render agreements with foreign states contingent and therefore impede the ability of the United States to communicate with foreign nations with a single voice, would chill the frank discussions with foreign governments that are essential to diplomatic relations, and will give foreign states pause before accepting Guantanamo detainees when they are informed that the acceptance carries the condition of a period of delay and then potential inquiry by a United States court into the communications between the United States and the foreign state and even into the treatment the foreign state anticipates providing the detainee following transfer. *See generally* Resp's' Opp. at 22; Tr. at 68-69; Prosper Decl. ¶ 12. These are considerable concerns. *See Crosby v. National Foreign Trade Council,* 530 U.S. 363, 381, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.Supp.2d 188
370 F.Supp.2d 188
**(Cite as: 370 F.Supp.2d 188)**

other governments"). Petitioners' only response is that they are unlikely to contest many transfers, which even if true does little to assuage these concerns because it is the *possibility* of judicial review in any particular case that will hamstring discussions *199 with foreign states. The substantial harm to the Executive in carrying out its foreign relations militates strongly against the injunction sought in this case.

**D. Public Interest**

Finally, there is a strong public interest against the judiciary needlessly intruding upon the foreign policy and war powers of the Executive on a deficient factual record. Where the conduct of the Executive conforms to law, there is simply no benefit--and quite a bit of detriment--to the public interest from the Court nonetheless assuming for itself the role of a guardian ad litem for the disposition of these detainees. *See People's Mojahedin Org.,* 182 F.3d at 23 ("[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch."). [FN11]

> FN11. Petitioners have suggested that this Court could make the 30- day notice of a proposed transfer a condition of the stay it is issuing in this case. *See infra.* However, the "standards for evaluating a motion for stay pending appeal are substantially the same as those for issuing a preliminary injunction," and so if the petitioners cannot meet the prerequisites of a motion for preliminary injunction (as the Court concludes), it is unlikely that they should receive that same relief through the backdoor of a stay. *Laborers' Intern. Union of North America v. National Post Office Mail Handlers, Watchmen, Messengers and Group Leaders Div. of Laborers Intern. Union of North America,* 1988 WL 142384, at *1 (D.D.C. Dec., 23, 1988). More to the point, perhaps, petitioners have not identified any legal authority that is likely to be interpreted by the Court of Appeals in its consideration of the legality of the detention of Guantanamo detainees that would bear on the question of the transfer of those detainees. In these circumstances, this Court cannot discern a reason why a stay of a *transfer* decision pending Court of Appeals resolution of the *detention* issue would be appropriate. The Court notes that petitioners did not even attempt to argue in their papers that <u>Federal

<u>Rule of Appellate Procedure 23</u> requires a stay of a transfer decision, because petitioners' habeas petition is not presently on appeal.

**II. Motion to Stay**

[4] Respondents have filed a motion to stay this case pending resolution of the appeals in *In re Guantanamo Detainee Cases,* 355 F.Supp.2d 443 (D.D.C.2005), and *Khalid v. Bush,* 355 F.Supp.2d 311 (D.D.C.2005), regarding whether the detention of the detainees in those cases violates any source of law. Petitioners have objected to a stay, arguing that the case should proceed on its merits. Other judges of this Court faced with this question have entered stays. *See, e.g., Abdullah v. Bush,* Case No. 05-CV-0023 (RWR) (March 16, 2005 Order); *Ameziane v. Bush,* Case No. 05-CV-0392 (ESH) (April 2, 2005 Order). In the interest of judicial economy and avoiding unnecessary litigation, the Court will grant respondents' motion to stay the case pending appellate review of important issues relating to the rights of Guantanamo detainees to challenge the lawfulness of their detention. Nothing will be gained by this Court addressing issues the D.C. Circuit is about to decide, particularly since a stay would in any event be entered were petitioners to prevail before this Court on those core issues (just as has transpired before Judge Green). In light of the stay, the Court will issue petitioners' requested order to show cause, but stay respondents' obligation to respond.

[5] Petitioners have also requested that respondents produce their factual returns, which DOD has compiled for each Guantanamo detainee. Respondents counter that the production of any factual returns should await the D.C. Circuit's decision. They note that given the large number of habeas corpus petitions, it would be a waste of resources to require production of factual returns before the D.C. Circuit has decided whether they are even necessary. Furthermore, respondents *200 have raised concerns about the security of the factual returns, noting at the motions hearing that there had been an isolated, inadvertent disclosure of classified information in one case. Although the Court is sensitive to the concerns of respondents, the factual returns appear necessary for petitioners' counsel effectively to represent petitioners. Indeed, even initial conversations by counsel with their clients may be very difficult without access to that basic factual information. Therefore, this Court will require respondents to produce the factual returns for petitioners within one hundred and twenty (120)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.Supp.2d 188
370 F.Supp.2d 188
**(Cite as: 370 F.Supp.2d 188)**

days.

### CONCLUSION

For the above reasons, petitioners' motion for a preliminary injunction is denied. The Court will grant respondents' motion to stay the case pending the resolution of the appeals in *In re Guantanamo Detainee Cases* and *Khalid v. Bush.* However, respondents must file with the Court and provide to petitioners' counsel the factual returns for all petitioners within 120 days. The Court will also enter by reference the protective orders and supplementary orders previously entered by Judge Green in *In re Guantanamo Detainee Cases,* No. 02-CV-0299. A separate order has been issued.

### ORDER

Upon consideration of petitioners' motion for a preliminary injunction and respondents' motion to stay, the memoranda of the parties, and the entire record herein, and for the reasons explained in the Memorandum Opinion issued on this date, it is this 21st day of April, 2005, hereby

**ORDERED** that petitioners' motion for a preliminary injunction is **DENIED**; it is further

**ORDERED** that petitioners' motion for an order to show cause is **GRANTED**; it is further

**ORDERED** that respondents' motion to stay the case is **GRANTED**, and respondents' obligation to show cause why the petition should not be granted is stayed; it is further

**ORDERED** that the case shall be stayed pending resolution of the appeals in *In re Guantanamo Detainee Cases,* 355 F.Supp.2d 443 (D.D.C.2005), and *Khalid v. Bush,* 355 F.Supp.2d 311 (D.D.C.2005). This stay shall not, however, prevent the parties from availing themselves of the procedures set forth in the Orders entered below, nor shall it bar the filing or disposition of any motion for emergency relief; it is further

**ORDERED** that the Court enters by way of reference the protective order and supplementary orders previously entered in *In re Guantanamo Detainee Cases,* No. 02-CV-0299, *et al.,* by Judge Joyce Hens Green. These include the Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba, first issued on November 8, 2004; the Order Addressing Designation Procedures for "Protected Information," entered on November 10, 2004; and the Order Supplementing and Amending Filing Procedures Contained in November 8, 2004 Amended Protective Order, issued on December 13, 2004; and it is further

**ORDERED** that respondents shall provide factual returns to the Court and to petitioners' counsel within one hundred twenty (120) days of the date of this Order.

370 F.Supp.2d 188

**Motions, Pleadings and Filings** (Back to top)

• _____1:05cv00345_____(Docket) (Feb. 17, 2005)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit U

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **AMEUR MAMMAR,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Civ. Action No. 05-573 (RJL)** |
| | ) | |
| **GEORGE W. BUSH, et al.,** | ) | |
| | ) | |
| **Respondents.** | ) | |

### MEMORANDUM OPINION
(May **2**, 2005) [#4]

Presently before the Court is petitioner Ameur Mammar's Motion for Preliminary Injunction seeking an Order, pursuant to Rule 65 of the Federal Rules of Civil Procedure and the All Writs Act, 28 U.S.C. § 1651, that would prohibit the respondents from transferring the petitioner from the United States Naval Base at Guantanamo Bay, Cuba without first providing the Court and counsel with thirty days' advance notice of such intended transfer. Pet.'s Mot. at 1. Upon due consideration of the parties' submissions and the entire record herein, the Court DENIES petitioner's motion for the following reasons.

In determining whether to grant a motion for a preliminary injunction, the Court must consider the following four factors: (1) whether the petitioner has demonstrated that there is a substantial likelihood that he will prevail on the merits of his claims; (2) whether the petitioner has shown that he would be irreparably harmed if injunctive relief is not awarded; (3) whether the issuance of injunctive relief would not "substantially harm" the other parties;

1

and (4) whether awarding the relief is in the public interest. *Cobell v. Norton*, 391 F.3d 251,

258 (D.C. Cir. 2004). The petitioner in this case has failed to meet his burden.

The petitioner's argument that an injunction should issue is premised upon mere

conjecture concerning his fate, and the fate of all detainees held at Guantanamo Bay. The

petitioner, for example, asserts that "the United States has secretly removed detainees and

others suspected of terrorist crimes to other countries for interrogation or detention without

complying with extradition or other legal process." Pet.'s Mot. at 2. And, with respect to

his particular situation, petitioner asserts that "he has reason to fear he will be transferred to

a country where he will be tortured and/or detained indefinitely without due process of law."

*Id.*

Despite these bear assertions, however, he has submitted no evidence or persuasive

legal authority, and his arguments for "success on the merits" and "irreparable harm" fall

well short of anything that would justify the issuance of a preliminary injunction. Indeed,

he relies almost exclusively upon "reports by American and foreign news organizations" and

"information and belief" to support his claim that the United States government has and will

transfer "detainees into the custody of foreign governments that employ inhumane

interrogation techniques. *Id.* at 2-5. Thus, based upon the record presented, the factors

required for the issuance of a preliminary injunction, *see Cobell*, 391 F.3d at 258, and after

due consideration of the reasoning of two other Judges on this Court who have also handled

2

this very issue,[1] this Court concludes that the petitioner's motion must be DENIED.  An

Order consistent with this Memorandum Opinion is being issued contemporaneously

herewith.

RICHARD J. LEON
United States District Judge

---

[1]     Judges Bates and Walton recently denied similar motions for injunctive relief. *See Al-Anazi, et al. v. Bush, et al.*, Civ. No. 05-345 (D.D.C. Apr. 21, 2005) (JDB); *Almurbati, et al. v. Bush, et al.*, Civ. No. 04-1254 (D.D.C. Apr. 14, 2005) (RBW).

# Exhibit V

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABU BAKKER QASSIM, *et al.*,          :
                                      :
          Petitioners,                :
                                      :
     v.                               :  Civil Action No. 05-0497 (JR)
                                      :
GEORGE W. BUSH, *et al.*,             :
                                      :
          Respondents.                :

## MEMORANDUM ORDER

     Abu Bakker Qassim and A'del Abdu Al-Hakim are Muslim

Uighurs, natives of China's western semi-autonomous Xinjiang

province.  They were captured by Pakistani security forces in

late 2001 or early 2002, delivered into U.S. custody, and held in

Afghanistan for approximately six months.  In June 2002 they were

transferred to the naval base at Guantanamo Bay, Cuba, where they

were detained as "enemy combatants," and where they remain to

this day, even though, nearly five months ago, a Combatant Status

Review Tribunal (CSRT) determined that "they should no longer be

classified as enemy combatants."  Resp't Mem. in Opp'n to Mot. to

Vacate Stay Order at 4, n.5.

     Qassim and Al-Hakim petitioned for a writ of habeas

corpus on March 10, 2005.  The government (which knew about the

CSRT determination but advised nobody) moved for a stay of

proceedings pending the Court of Appeals' decision in the

consolidated appeals of Khalid v. Bush, 355 F. Supp. 2d 311

(D.D.C. 2005), and In re Guantanamo Detainee Cases, 355 F. Supp.

2d. 443 (D.D.C. 2005).  Petitioners (whose counsel were ignorant
of the CSRT determination) moved for a preliminary injunction.
On April 13, 2005, I (also ignorant of the CSRT determination)
denied the motion for preliminary injunction and granted a stay
of all proceedings concerning these petitioners, including "their
release, repatriation, or rendition."[1]

In the midst of this motions practice, counsel for
petitioners twice sought information from the government about
proceedings before the CSRT, see Manning Decl., Exs. G-H.  The
government did not respond.[2]  It was only in mid-July, when
petitioners' counsel traveled to Guantanamo Bay to meet their
clients for the first time, that counsel were informed by their
clients that the CSRT had found them not to be enemy combatants.
After this information was confirmed by a JAG officer stationed
at Guantanamo Bay, Willett Decl. ¶ 15, counsel filed an emergency
motion to vacate the stay order and for their clients' immediate
release.  The government opposed, and a hearing was held on
August 1, 2005.

---

[1] Both sides have appealed that stay order, but the parties agree
that the pendency of their appeals does not oust this Court of
jurisdiction to decide the matters presented by petitioners' instant
motions.

[2] At a hearing held on August 1, 2005, the government acknowledged
receiving informal discovery requests for the 120 detainee cases it
has, and stated that it generally did not respond to such requests
"simply because we're not in a position to do it, especially when
these cases should be stayed because the legal issues involved are
before the Court of Appeals."  August 1, 2005 Tr. at 16.

The status of "enemy combatant" has been, until now,
the only handhold for the government's claim of executive
authority to hold detainees at Guantanamo.  It is the only
rationale approved by the Supreme Court, see Hamdi v. Rumsfeld,
124 S.Ct. 2633, 2639-40 (2004).  Now that these petitioners are
"no longer enemy combatants" (NLECs[3]), the government has had to
articulate a new reason for continuing to hold them.  That
reason, asserted at the August 1 hearing and again in the
government's post-hearing memorandum, is "the Executive's
necessary power to wind up wartime detentions in an orderly
fashion."  Resp't Supplemental Mem. at 12.  There is no basis for
this claimed authority except the Executive's assertion of it.

It is not necessary to decide whether such a "wind up"
power really exists, however, because the parties agree that
Qassim and Al-Hakim should be and will be released.  Their
disagreement is about when they will be released, what is to
become of them pending their release, and what power, if any,
this Court has to control events.  It is undisputed that the
government cannot return these petitioners to China, because they

---

[3] Petitioners suggest that the designation "no longer enemy
combatant" has Orwellian overtones, but the "no longer" language
appears to be fairly rooted in the Supreme Court's holding that a
detainee "seeking to challenge his classification as an enemy
combatant" must be given "notice of the factual basis for his
classification, and a fair opportunity to rebut the Government's
factual assertions . . . ." Hamdi, 124 S.Ct. at 2648.

-3-

would be persecuted there,[4] but, the government says,
notwithstanding sensitive, ongoing diplomatic efforts to place
them, it has no place to send them at the moment.  If that is the
case, petitioners say, and if they cannot be released to civilian
quarters on the Guantanamo Bay base (a proposition that I have
already rejected in open court), then the government should be
ordered to "produce at the hearing [here in Washington, D.C.] the
bod[ies] of the person[s] detained" pursuant to the plain
language of 28 U.S.C. § 2243.  The government opposes that
suggestion, arguing (I) that the stay should remain in effect
because the scope of the habeas writ as it applies to Guantanamo
detainees is an open question that is still pending, undecided,
before the Court of Appeals, and (ii) that in any case the habeas
statute is trumped by the exclusive power of the Executive to say
who can and who cannot enter the United States.

     All the Supreme Court did, in Rasul v. Bush, 124 S.Ct.
2686 (2004), was confirm the jurisdiction of the federal courts
"to determine the legality of the Executive's potentially
indefinite detention of individuals who claim to be wholly

---

     [4] "The [Chinese] Government used the international war on terror
as a pretext for cracking down harshly on suspected Uighur separatists
expressing peaceful political dissent and on independent Muslim
religious leaders." United States Department of State, Country Reports
on Human Rights Practices 2004: China, available at
http://www.state.gov/g/drl/rls/hrrpt/2004/41640.htm.  The State
Department reports executions, torture, and other mistreatment of
suspected separatist Uighurs by the Chinese government.

innocent of wrongdoing." <u>Id.</u> at 2699.  It did not decide what

<u>relief</u> might be available to Guantanamo detainees by way of

habeas corpus, nor, obviously, did it decide what relief might be

available to detainees who have been declared "no longer enemy

combatants."  Neither of the twinned cases now pending before the

Court of Appeals presents, or appears to have contemplated, the

case of a detainee who has been through the CSRT process and

declared no longer an enemy combatant.  Judge Joyce Green's

ruling in <u>Guantanamo Detainee Cases</u> was that Guantanamo detainees

have enforceable <u>constitutional</u> rights, 355 F. Supp. 2d at 457 --

a proposition that is unnecessary to either side's position in

the present case.  Judge Leon's ruling in <u>Khalid</u>, that there is

no cognizable legal theory on which a writ of habeas corpus could

actually issue in such a case, 355 F. Supp. 2d at 321, did not

involve and did not consider the case of an "NLEC" detainee.

Thus these petitioners are correct, as a formal, legal matter, in

their insistence that the issue presented by this case is not

before the Court of Appeals.  As a practical matter, however, it

is a safe prediction[5] that any order requiring the immediate

release of these petitioners would be appealed, that the Court of

Appeals would enter a stay, as it did in <u>Guantanamo Detainee</u>

<u>Cases</u>, and that whatever processes are now underway for

---

[5] "The prophecies of what the courts will do in fact, and nothing
more pretentious, are what I mean by the law." Holmes, <u>The Path of the</u>
<u>Law</u>.

- 5 -

alleviating the conditions of petitioners' detention and
arranging for their relocation to another country would be put on
hold pending the appeal.

Turning to the question of whether this court or any
court has the power to command the production of the body of a
habeas petitioner when obedience to that command would bring an
alien into the United States: The authorities cited by the
government are for the most part inapposite; this case does not
involve judicial review of an executive branch decision to
exclude aliens.  The government may have reason to suspect that
petitioners' "primary interest in being brought to the United
States is to derive various immigration-related benefits," Resp't
Supplemental Mem. at 16, but petitioners' motives are not
material to the question at hand.  The government correctly
points out that the language of the habeas statute that
contemplates the physical production of a petitioner is rarely
used, but this is a rare case.  And the government's argument
that the Real ID Act controls the interpretation of the habeas
statute, because it was enacted later, strikes me as specious.

It is unnecessary, however -- at least for now -- to
decide whether this Court has the power to require the production
of the petitioners.  The idea of such an order emerged during the
August 1 hearing as one way of dealing with petitioners'
complaints that they were denied telephone communication with

- 6 -

their families, that they could meet their lawyers only when chained to tables or walls in detention cells, and that the scarcity of Uighur interpreters and the red tape associated with clearing interpreters to work with counsel made regular attorney-client communication impossible.  The government's supplemental memorandum makes substantial concessions on those points.

Petitioners have asked for a "hearing on the conditions of interim relief."  Giving it that label would suggest a ruling on the question of whether the Court has the power to grant "relief" to these petitioners.  Nevertheless, as it appears that both sides seek a just and honorable solution to the practical problem before us, a hearing will be set for the purpose of considering and perhaps reaching agreement on the conditions in which the petitioners are live, and the privileges they will have, pending their relocation to another country.

It is accordingly:

ORDERED that a hearing is set for **August 25, 2005, at
2:00 p.m.**  And it is

FURTHER ORDERED that the government be prepared at the
time of that hearing to make appropriate disclosures to the Court
in camera augmenting the declaration of Pierre-Richard Prosper
concerning the process and status of efforts to relocate the
petitioners.


                              JAMES ROBERTSON
                    United States District Judge