# EXHIBIT 2

i

**Appendix**

DECLARATION OF STEPHEN ABRAHAM
Lieutenant Colonel, United States Army Reserve

I, Stephen Abraham, hereby declare as follows:

1.    I am a lieutenant colonel in the United States Army Reserve, having been commissioned in 1981 as an officer in Intelligence Corps. I have served as an intelligence officer from 1982 to the present during periods of both reserve and active duty, including mobilization in 1990 ("Operation Desert Storm") and twice again following 9-11. In my civilian occupation, I am an attorney with the law firm Fink & Abraham LLP in Newport Beach, California.

2.    This declaration responds to certain statements in the Declaration of Rear Admiral (Retired) James M. McGarrah ("McGarrah Dec."), filed in *Bismullah v. Gates*, No. 06-1197 (D.C. Cir.). This declaration is limited to unclassified matters specifically related to the procedures employed by Office for the Administrative Review of the Detention of Enemy Combatants ("OARDEC") and the Combatant Status Review Tribunals ("CSRTs") rather than to any specific information gathered or used in a particular case, except as noted herein. The contents of this declaration are based solely on my personal observations and experiences as a member of OARDEC. Nothing in this declaration is intended to reflect or represent the official opinions of the Department of Defense or the Department of the Army.

3.    From September 11, 2004 to March 9, 2005, I was on active duty and assigned to OARDEC. Rear Admiral McGarrah served as the Director of OARDEC during the entirety of my assignment.

4.    While assigned to OARDEC, in addition to other duties, I worked as an agency liaison, responsible for coordinating with government agencies, including certain Department of Defense ("DoD") and non-DoD organizations, to gather or

ii

validate information relating to detainees for use in CSRTs. I also served as a member of a CSRT, and had the opportunity to observe and participate in the operation of the CSRT process.

5.      As stated in the McGarrah Dec., the information comprising the Government Information and the Government Evidence was not compiled personally by the CSRT Recorder, but by other individuals in OARDEC. The vast majority of the personnel assigned to OARDEC were reserve officers from the different branches of service (Army, Navy, Air Force, Marines) of varying grades and levels of general military experience. Few had any experience or training in the legal or intelligence fields.

6.      The Recorders of the tribunals were typically relatively junior officers with little training or experience in matters relating to the collection, processing, analyzing, and/or dissemination of intelligence material. In no instances known to me did any of the Recorders have any significant personal experience in the field of military intelligence. Similarly, I was unaware of any Recorder having any significant or relevant experience dealing with the agencies providing information to be used as a part of the CSRT process.

7.      The Recorders exercised little control over the process of accumulating information to be presented to the CSRT board members. Rather, the information was typically aggregated by individuals identified as case writers who, in most instances, had the same limited degree of knowledge and experience relating to the intelligence community and intelligence products. The case writers, and not the Recorders, were primarily responsible for accumulating documents, including assembling documents to be used in the drafting of an unclassified summary of the factual basis for the detainee's designation as an enemy combatant.

8.      The information used to prepare the files to be used by the Recorders frequently consisted of finished intelligence

iii

products of a generalized nature - often outdated, often "generic," rarely specifically relating to the individual subjects of the CSRTs or to the circumstances related to those individuals' status.

9.      Beyond "generic" information, the case writer would frequently rely upon information contained within the Joint Detainee Information Management System ("JDIMS"). The subset of that system available to the case writers was limited in terms of the scope of information, typically excluding information that was characterized as highly sensitive law enforcement information, highly classified information, or information not voluntarily released by the originating agency. In that regard, JDIMS did not constitute a complete repository, although this limitation was frequently not understood by individuals with access to or who relied upon the system as a source of information. Other databases available to the case writer were similarly deficient. The case writers and Recorders did not have access to numerous information sources generally available within the intelligence community.

10.     As one of only a few intelligence-trained and suitably cleared officers, I served as a liaison while assigned to OARDEC, acting as a go-between for OARDEC and various intelligence organizations. In that capacity, I was tasked to review and/or obtain information relating to individual subjects of the CSRTs. More specifically, I was asked to confirm and represent in a statement to be relied upon by the CSRT board members that the organizations did not possess "exculpatory information" relating to the subject of the CSRT.

11.     During my trips to the participating organizations, I was allowed only limited access to information, typically prescreened and filtered. I was not permitted to see any information other than that specifically prepared in advance of my visit. I was not permitted to request that further searches

iv

be performed. I was given no assurances that the information provided for my examination represented a complete compilation of information or that any summary of information constituted an accurate distillation of the body of available information relating to the subject.

12.　　I was specifically told on a number of occasions that the information provided to me was all that I would be shown, but I was never told that the information that was provided constituted all available information. On those occasions when I asked that a representative of the organization provide a written statement that there was no exculpatory evidence, the requests were summarily denied.

13.　　At one point, following a review of information, I asked the Office of General Counsel of the intelligence organization that I was visiting for a statement that no exculpatory information had been withheld. I explained that I was tasked to review all available materials and to reach a conclusion regarding the non-existence of exculpatory information, and that I could not do so without knowing that I had seen all information.

14.　　The request was denied, coupled with a refusal even to acknowledge whether there existed additional information that I was not permitted to review. In short, based upon the selective review that I was permitted, I was left to "infer" from the absence of exculpatory information in the materials I was allowed to review that no such information existed in materials I was not allowed to review.

15.　　Following that exchange, I communicated to Rear Admiral McGarrah and the OARDEC Deputy Director the fundamental limitations imposed upon my review of the organization's files and my inability to state conclusively that no exculpatory information existed relating to the CSRT subjects. It was not possible for me to certify or validate the non-existence of exculpatory evidence as related to any individual undergoing the CSRT process.

v

16.    The content of intelligence products, including data-
bases, made available to case writers, Recorders, or liaison
officers, was often left entirely to the discretion of the or-
ganizations providing the information.  What information
was not included in the bodies of intelligence products was
typically unknown to the case writers and Recorders, as was
the basis for limiting the information.  In other words, the
person preparing materials for use by the CSRT board mem-
bers did not know whether they had examined all available
information or even why they possessed some pieces of in-
formation but not others.

17.    Although OARDEC personnel often received large
amounts of information, they often had no context for deter-
mining whether the information was relevant or probative
and no basis for determining what additional information
would be necessary to establish a basis for determining the
reasonableness of any matter to be offered to the CSRT board
members.  Often, information that was gathered was dis-
carded by the case writer or the Recorder because it was con-
sidered to be ambiguous, confusing, or poorly written.  Such
a determination was frequently the result of the case writer or
Recorder's lack of training or experience with the types of in-
formation provided.  In my observation, the case writer or
Recorder, without proper experience or a basis for giving
context to information, often rejected some information arbi-
trarily while accepting other information without any articu-
lable rationale.

18.    The case writer's summaries were reviewed for qual-
ity assurance, a process that principally focused on format
and grammar.  The quality assurance review would not ordi-
narily check the accuracy of the information underlying the
case writer's unclassified summary for the reason that the
quality assurance reviewer typically had little more experi-
ence than the case writer and, again, no relevant or meaning-
ful intelligence or legal experience, and therefore had no

vi

skills by which to critically assess the substantive portions of the summaries.

19.    Following the quality assurance process, the unclassified summary and the information assembled by the case writer in support of the summary would then be forwarded to the Recorder. It was very rare that a Recorder or a personal representative would seek additional information beyond that information provided by the case writer.

20.    It was not apparent to me how assignments to CSRT panels were made, nor was I personally involved in that process. Nevertheless, I discerned the determinations of who would be assigned to any particular position, whether as a member of a CSRT or to some other position, to be largely the product of ad hoc decisions by a relatively small group of individuals. All CSRT panel members were assigned to OARDEC and reported ultimately to Rear Admiral McGarrah. It was well known by the officers in OARDEC that any time a CSRT panel determined that a detainee was not properly classified as an enemy combatant, the panel members would have to explain their finding to the OARDEC Deputy Director. There would be intensive scrutiny of the finding by Rear Admiral McGarrah who would, in turn, have to explain the finding to his superiors, including the Under Secretary of the Navy.

21.    On one occasion, I was assigned to a CSRT panel with two other officers, an Air Force colonel and an Air Force major, the latter understood by me to be a judge advocate. We reviewed evidence presented to us regarding the recommended status of a detainee. All of us found the information presented to lack substance.

22.    What were purported to be specific statements of fact lacked even the most fundamental earmarks of objectively credible evidence. Statements allegedly made by percipient witnesses lacked detail. Reports presented generalized statements in indirect and passive forms without stating the

vii

source of the information or providing a basis for establish-
ing the reliability or the credibility of the source.  Statements
of interrogators presented to the panel offered inferences
from which we were expected to draw conclusions favoring a
finding of "enemy combatant" but that, upon even limited
questioning from the panel, yielded the response from the
Recorder, "We'll have to get back to you."  The personal rep-
resentative did not participate in any meaningful way.

23.    On the basis of the paucity and weakness of the in-
formation provided both during and after the CSRT hearing,
we determined that there was no factual basis for concluding
that the individual should be classified as an enemy combat-
ant.  Rear Admiral McGarrah and the Deputy Director im-
mediately questioned the validity of our findings.  They di-
rected us to write out the specific questions that we had
raised concerning the evidence to allow the Recorder an op-
portunity to provide further responses.  We were then ordered
to reopen the hearing to allow the Recorder to present further
argument as to why the detainee should be classified as an
enemy combatant.  Ultimately, in the absence of any substan-
tive response to the questions and no basis for concluding
that additional information would be forthcoming, we did not
change our determination that the detainee was not properly
classified as an enemy combatant.  OARDEC's response to
the outcome was consistent with the few other instances in
which a finding of "Not an Enemy Combatant" (NEC) had
been reached by CSRT boards.  In each of the meetings that I
attended with OARDEC leadership following a finding of
NEC, the focus of inquiry on the part of the leadership was
"what went wrong."

24.    I was not assigned to another CSRT panel.

    I hereby declare under the penalties of perjury based
on my personal knowledge that the foregoing is true and ac-
curate.

viii

Stephen Abraham

Dated: June 15, 2007